# 646

## DE MILLE CO. *v.* CASEY.

THE DE MILLE COMPANY, a New York Corporation, BEATRICE M. DE MILLE and CECIL B. DE MILLE, Plaintiffs, *v.* PAT J. CASEY, PROTECTIVE AMUSEMENT COMPANY and BIOGRAPH COMPANY, Defendants.

(Supreme Court, New York County, June, 1921.)

Contracts — when executory contract may be terminated by injured party — equitable relief — motion pictures — royalties — accounting.

Where there has been a breach of an executory contract whether it be in payment of the consideration or otherwise so substantial and fundamental as to strongly tend to the defeat of the essential object of the parties in making the contract, it may be terminated by the injured party. (P. 653.)

Though the injured party has the right to terminate the contract it does not necessarily follow that a court of equity will decree a cancellation thereof, but where the contract confers upon the other party the privilege to use and enjoy a property right of the injured party, the continued use of which works to its injury, notwithstanding a material breach of the contract, equity may grant relief. (Pp. 654, 655.)

Plaintiff, the owner of the copyright of a number of stage plays, granted to defendant C:, and his assigns, a license to dramatize, produce and exhibit them in the form of motion pictures by a contract reserving a weekly royalty for the use of each of the several plays wheresoever and by whomsoever exhibited, such contract to continue for a term of eight years from its date and thereafter, as long as the royalties should be paid. Although the films were first available for rental to exhibitors in May, 1914, no royalties were paid after the fifth of the following October, at which time only thirteen-sixteenths of the term of the contract had expired. There was no express repudiation of liability to pay royalties either on the part of C or his assignee upon which he depended to be put in funds and which had so placed itself in the hands of another as to incapacitate itself to collect a part of the earnings to which it was entitled. Plaintiff gave written notice to all parties that it elected to terminate the contract because of default of the payment of royalties and that further exhibition of the films was prohibited, but wholly ignoring such notice the exhibition of

the plays was continued. In an action to have the contract terminated and for an injunction and accounting, *held;*

That it was the effect of the breach upon the mutuality of the contract for which the law has regard and that whether plaintiff's failure to receive royalties was due to C's repudiation of the contract, to wilfulness or to impecuniosity was immaterial, and that plaintiff would be granted a decree that will make effective the termination of the contract, which, theoretically, was accomplished by the notice given by plaintiff. (Pp. 653–655.)

One of the functions of equity being to avoid unnecessary litigation and to administer such relief as the nature of the case and the facts, at the end of the litigation, demand, the decree to be entered should carry an accounting by C down to the date of its entry, but on no principle may the other defendant, whose only interest in the plays was subject to the contract with C, be held to account either before or after the notice of termination. (Pp. 657–659.)

Action to terminate contract and for an injunction and accounting.

Ernst, Fox & Cane (Nathan Burkan and Melville H. Cane, of counsel), for plaintiffs.

Prince & Nathan (Sidney J. Loeb and Leon M. Prince, of counsel), for defendant Pat J. Casey.

Aronson & Salant (Louis Salant, Mortimer Fishel and I. M. Dittenhoefer, of counsel), for defendant Protective Amusement Company.

Charles F. Kingsley (Charles F. Kingsley and Anthony J. Ernest, of counsel), for defendant Biograph Company.

Hotchkiss, J. The record in this case is voluminous, but what I conceive to be the material facts are comparatively simple. The De Mille Company was the owner of copyrights of thirteen stage plays. On March 19, 1913, plaintiffs entered into a contract

with the defendant Casey by which Casey and his assignee were given the sole and exclusive right to produce and to license others to produce said plays in motion pictures, in consideration of which Casey agreed to pay the De Mille Company weekly a royalty of $75 per week for each and every week that each of said plays should be exhibited. In the event Casey sold the right to produce any of the pictures in any foreign country the De Mille Company was to receive five per cent of all sums realized therefrom by Casey or his assigns, the same to be paid weekly or within one week after the receipt of said earnings by Casey. Casey's rights under the contract were to continue for eight years from the date thereof " and thereafter as long as the royalties are paid at the rate and as herein provided." On receipt of the manuscripts of the plays Casey was to pay $1,000, and sixty days thereafter the further sum of $1,250 as advance royalties. Casey received the manuscripts and paid the $2,250. The Protective Amusement Company (hereinafter called the Amusement Company), in which Casey and Klaw & Erlanger were the ones principally interested, was promptly organized, and Casey transferred to this company his rights under the De Mille contract. On May 28, 1913, the Amusement Company entered into a contract with the Biograph Company, the material terms of which were as follows: The Amusement Company agreed to provide copyrights, plays and subjects for motion pictures, and also to supply the actors, scenery, costumes and other accessories and direct the work of the actors in the making of pictures; the Biograph Company agreed to take the pictures and make the films; the Amusement Company was to make contracts with exhibitors for the exhibition of the pictures, the films for which were to be delivered to exhibitors by the Biograph Company;

the Amusement Company was to collect the rentals from the exhibitors and was to pay the Biograph Company a fixed sum per foot of film and reimburse it for certain expenses, and in addition was to pay that company forty per cent of the remaining sum; the Biograph Company agreed to render weekly statements of the sums due it, and the contract was to continue for ten years from July 15, 1913. In all some thirty-four plays, including plaintiff's thirteen, came under the operations of this contract, and of the plaintiff's plays films were made of twelve (all except " The Royal Mounted") between August 30, 1913, and March 30, 1914. These twelve films were first " released," *i. e.*, delivered to exhibitors, between May, 1914, and May, 1916. Certain of the more popular of the twelve were, after an initial period of exhibition, " released " a second time for a further run. The first distribution of films to exhibitors was made by the Amusement Company through the medium of one Waters as agent. Films of nine plays were thus marketed by Waters, who between March and June, 1914, paid the Biograph Company $19,500 as its proportion of the rentals collected. Casey rendered statements and made payments to the De Mille Company up to October 5, 1914. These statements covered but four of the films, although during the same period at least two other films were exhibited. No statements were ever made by Casey after said date, and the statements that were made were not based upon any accurate data because Waters never made written reports. The figures thus reported by Casey were by him made up from information gleaned in part from rumor and sources of theatrical publicity and in part from conversations with Waters, but of this the De Mille Company was not told. In the spring of 1914 Klaw was president or treasurer or

both, Casey vice-president, and Erlanger managing director of the Amusement Company. Klaw & Erlanger were also largely interested in the General Film Company, a corporation which controlled many local exchanges or agencies for the renting of films. At some time during this period, and as the result of conferences between Kennedy, president of the Biograph Company, Klaw, Erlanger and Casey, the Amusement Company was practically eliminated from all active part in the production and distribution of the films of plaintiff's plays. There was no written agreement, and exactly what agreement was made is not clear. A resolution of the board of directors of the General Film Company entered in its minutes is the only writing referring to the transaction, and from this it appears that the General Film Company was substituted for the Amusement Company as the distributor of the films, and that from the rentals it received from exhibitors the film company was to pay certain fixed sums to the Biograph Company and seventy per cent of the remaining gross receipts. Exactly what compensation this new arrangement left for the Amusement Company does not appear. At or about this time arrangements were made to market the films abroad, and one Nichols was chosen as the medium for this work, which resulted in the receipt of substantial sums. The General Film Company received weekly reports from its exchanges of the placing of pictures and the rentals therefrom, and every two weeks that company reported to the Biograph Company and made the payments to which the latter company was entitled. This custom continued until about June, 1919, when the General Film Company became bankrupt. For a short time the Biograph Company from time to time made certain reports of its receipts to the Amusement Company,

but there was no regularity in the rendition of these reports, which finally ceased. The Biograph Company paid no money to the Amusement Company and claimed to withhold payments because of debts asserted to be owing to it by that company. The sums earned by said films, and to which the De Mille Company was entitled as royalties under its contract with Casey, aggregated a sum greatly in excess of the total amount paid by Casey to the De Mille Company. Repeated demands were made by plaintiffs upon Casey to comply with his contract, but his uniform excuse for failing so to do was that he could get no statements showing what use had been made of the films. On February 25, 1916, plaintiffs gave to all the defendants written notice that it elected to terminate the contract with Casey because of his failure to pay royalties, and that further exhibition of the films was prohibited. This notice was wholly ignored and the exhibition of the plays was continued. It is contended by the Amusement Company that at all times it in good faith and to the best of its ability sought to secure from both the Biograph Company and the General Film Company statements of the use made of the films and of the moneys earned, and that its failure so to do was in no way attributable to any neglect on its part. A similar claim is advanced on the part of Casey. There is much in the record to cast suspicion upon the bona fides of each of these defendants, but inasmuch as in my opinion this feature of the case is immaterial, no finding need be made thereon. In the present action plaintiffs seek to have the contract with Casey terminated, that the several defendants be enjoined from further use of the films and that they account. The primary question is, may the contract be annulled? A brief analysis of its nature and terms will be helpful. It was a license

to Casey and his assigns to enjoy some of the rights (whatever they may have been) inherent in plaintiff as owner of the copyrights in the plays, *i. e.*, the rights to dramatize, produce and exhibit them in the form of motion pictures. For the use of each of the several plays a weekly royalty was reserved for each week it was exhibited, "wheresoever and by whomsoever," and this royalty was to be paid weekly. An advance on account of prospective royalties was paid, but inasmuch as the royalties earned exceeded this sum this advance payment is not material as an equitable feature in defendants' favor in determining plaintiffs' right to cancel. *Hurst* v. *Trow P. & B. Co.*, 2 Misc. Rep. 361; affd., on opinion below, 142 N. Y. 637. The term of the contract was eight years from its date, "and thereafter," as long as the prescribed royalties should be paid. It ran to Casey and his assignee. It was assigned. The films were first available for rental to exhibitors in May, 1914. No royalties were paid after October 5, 1914. At this time only about thirteen-sixteenths of the eight-year term had expired. This failure to pay may or may not have been due to willfulness, but there was never on the part of Casey or his assignee any express repudiation of liability to pay. Stated in terms most favorable to the defendants, Casey had availed himself of his right to assign, and his assignee, upon which he depended to be put in funds, had so placed itself in the hands of another as to incapacitate itself to collect the part of the earnings to which it was entitled. It thus appears that save for a comparatively insignificant period the consideration for the contract failed, and under circumstances which gave no reasonable ground for supposing that this failure was not permanent. It is not unusual to characterize the annulling of an executory contract for breaches

affecting the consideration as a " rescission " and to attempt to adjudge the rights of the parties by the rules applicable where " rescission " *ab initio* is sought in a court of equity. Counsel for certain of these defendants have been betrayed into this mistake. But as was said in *Elterman* v. *Hyman,* 192 N. Y. 113, 126: " The termination of a contract as to the future by one party owing to the default of the other is a rescission neither *ab initio,* nor in any other true sense." See, also, *Anvil Mining Co.* v. *Humble,* 153 U. S. 540, 551; *Hurst* v. *Trow P. & B. Co., supra.* Without regard for what may be the rule in other jurisdictions, I think there is ample authority in this state for the proposition that where there has been a breach of an executory contract such as the present, whether it be in the payment of the consideration or otherwise, " so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract," it may be terminated by the injured party. *Callanan* v. *Keeseville, A. C. & L. C. R. R. Co.,* 199 N. Y. 268; *Raftery* v. *World Film Corp.,* 180 App. Div. 475; *Hurst* v. *Trow P. & B. Co., supra; Saltus* v. *Belford Co.,* 133 N. Y. 499; *Hyatt* v. *Ingalls,* 124 id. 93; *Bobbs-Merrill Co.* v. *Universal Film Co.,* 160 N. Y. Supp. 37. As a practical matter it made no difference to the De Mille Company whether its failure to receive royalties was due to a repudiation of the contract on Casey's part, to willfulness or to impecuniosity. Whether the default was willful or from neglect merely is in my opinion immaterial. See *Callanan* v. *Keeseville, A. C. & L. C. R. R. Co., supra,* 287. It is the result of the breach, not the motive, the effect of the breach upon the mutuality of the contract, for which the law has regard. As Prof. Williston says in his essay on " Repudiation of Contracts " (14 Harv. Law Rev. 317): " The

essential element which exists in all these cases is something still to be performed in the future under the contract which, as he has made manifest, he is not going to perform. Whether the reason he discloses for his prospective failure to perform is because he cannot or because he will not seems wholly immaterial, though the word ' repudiation ' is more strictly appropriate to cases where an intention not to perform is manifested irrespective of ability.'' See, also, 2 Williston Cont. 1656. An analogy to the right to abrogate in such cases as the present is found in the former common-law rule in this state (*Kokomo Strawboard Co.* v. *Inman,* 134 N. Y. 92; *Nichols* v. *Scranton Steel Co.,* 137 id. 471) governing the seller's right to terminate for non-payment in the case of sales of goods deliverable and to be paid for in installments. The present test in such cases, as prescribed by the Sales Act, has been expressed in language that may well be adopted in actions such as this, namely, that the right to terminate '' depends upon the question whether the default is so substantial and important as in truth and fairness to defeat the essential purpose of the parties.'' *Helgar Corp.* v. *Warner's Features,* 222 N. Y. 449, 453. Of course, because a plaintiff may have the right to terminate the particular contract, it does not necessarily follow that he may come into a court of equity for a decree of cancellation. His rights may be such as are solely cognizable in a court of law, where a judgment for damages will afford complete compensation and relief for any injury he has suffered. Such is the case arising from the breach of an ordinary contract for the sale and delivery of goods in installments. But in a case like the present, where the contract confers upon the defendant the privilege to use and enjoy a property right belonging to the plaintiff, which privilege the

defendant continues to enjoy and to make use of to plaintiff's injury, notwithstanding his (defendant's) material breach of the contract, plaintiff invokes but an elementary principle of equity jurisdiction when he seeks a decree to establish his rights. In such a case plaintiff may or may not, before he commences his action, have given defendant notice of his election to terminate. But if such notice has been given and, as here, defendant has ignored the notice, reason and justice require that plaintiff be given a decree that will make effective the termination which was theoretically accomplished by the notice. There is a still further ground on which the jurisdiction of a court of equity may here be invoked. By the very nature of its agreement with Casey the De Mille Company could have no knowledge, save as gained from rumor and gossip, of the extent of the use made of the films. Casey, too, had put it beyond his power to obtain more extended information, save as it might be accorded to him by the Biograph Company, which latter company had in effect repudiated all obligation to enlighten the Amusement Company concerning the exhibition of the films or the earnings therefrom. Such was the condition at the time plaintiffs served their notice of revocation, and so it continued, the Biograph paying no heed to the notice. The territory in which the films might be exhibited was unlimited, and the earning value of plaintiffs' plays in the form of motion pictures necessarily diminished as the plays became more familiar to the public through the exhibition of these films. But to estimate the resulting damage would be difficult, if not impossible, and from this circumstance equity will assume jurisdiction. *Callanan* v. *Keeseville, A. C. & L. C. R. R. Co., supra,* 287; *Raftery* v. *World Film Corporation, supra,* 482. The principle of law on which the right to terminate in any case

exists is founded upon the doctrine of failure of consideration and is one of the phases of the law of anticipatory breach. Precisely to what class of contracts this doctrine is applicable I do not consider it necessary to determine. *Kelly* v. *Security Mutual Life Insurance Co.,* 186 N. Y. 16; *McCready* v. *Lindenborn,* 172 id. 400; *Nichols* v. *Scranton Steel Co., supra; Werner* v. *Werner,* 169 App. Div. 9; *Bauchle* v. *Bauchle,* 185 id. 590; *Moore* v. *Security Trust & Life Insurance Co.,* 168 Fed. Repr. 496; *Washington County* v. *Williams,* 111 id. 801; *Roehm* v. *Horst,* 178 U. S. 1. The right to terminate has so often been the subject of a favorable decree in actions analogous to the present (*vide* cases first hereinbefore cited) that I refrain from analyzing the cases last above cited and from attempting further to sustain the jurisdiction of the court to entertain this action. Plaintiffs' right to terminate the contract and to come into equity for a decree making that termination effective having been established, it remains to inquire what further relief in the way of accounting may be had against the various defendants. Plaintiffs never copyrighted any screen versions of their stage plays. Screen copyrights for a number of the plays in question were put in evidence. They were taken out in the name of Klaw & Erlanger, who were executive officers of and evidently in control of the Amusement Company. By what right or under what circumstances these persons secured these copyrights does not appear. The remainder of the screen plays were not shown to have been copyrighted by anybody. No evidence was offered to connect plaintiffs with any of the screen copyrights. They are not even mentioned in the complaint or in any of the answers, and Klaw & Erlanger are not parties hereto. The question of screen copyright or the liability of any of the defendants to

account because thereof, either before or after the notice of revocation of February 25, 1916, does not, in my opinion, enter into the case. If the plaintiffs' right to an accounting against any of the defendants depended upon the Federal Copyright Law, concededly this court would be without jurisdiction to enforce it. Whatever rights plaintiffs have must, if sought to be enforced in this action, be such as arise under the contract or as the common law gives. The license to exhibit ran to Casey and his assignee, but the promise to pay was by Casey " wheresoever and by whomsoever " the films might be exhibited. Casey's personal liability to account, at least up to notice of termination, is thus so clear from the terms of the contract itself as to render unnecessary any consideration of the law governing the liability of a party to a contract who has assigned his rights thereunder. See *Wilson* v. *Mechanical Orguinette Co.*, 170 N. Y. 542. For the period subsequent to the notice of revocation the right to compel Casey to account is not clear. It may be conceded that the notice terminated the contract without the aid of a court of equity. *Schalkenbach* v. *National V. Co.*, 129 App. Div. 389; *Russell H. & I. M. Co.* v. *Utica D. F. & T. Co.*, 195 N. Y. 54, where there had been no notice. But to make the notice of revocation effectual and to put a stop to the wrongs growing out of defendants' refusal to respect the notice an appeal to a court of equity was necessary. One of the functions of equity is to avoid unnecessary litigation, and it is a truism to say that when courts of equity have once assumed jurisdiction it is their practice to administer such relief as the nature of the case and the facts demand and to bring that relief down to the close of the litigation. *Kilbourne* v. *Board of Supervisors*, 137 N. Y. 170, 178. Casey is in no position to resist the exercise of such jurisdiction.

42

The estoppel which closes his mouth to dispute plaintiffs' title while the contract was in operation, and before it was terminated, has continued during the time he has resisted plaintiffs' present attempt to enforce recognition of their rights by judicial decree. Why, then, should this decree not carry Casey's accounting down to the date of its entry? Why remit plaintiff to some other action for such of his license fees as have arisen subsequent to his notice of termination? I can see no reason for so doing, and unless restrained by controlling authority the plainest principles of equity require that such a course should be avoided. But it may be said that in *Hyatt* v. *Ingalls* and *Saltus* v. *Belford Company, supra,* and similar cases the accounting was expressly limited to the date when the contract was terminated or rescinded. True, but I think the cases are distinguishable. In those cases and in all similar cases of contracts involving copyrights or patents, a state court cannot ignore the fact that its jurisdiction is strictly limited to such rights as arise from the contract. From and after the termination of the contract in such cases the compensation for the use of the copyright or patent is strictly a matter for the federal courts. This difference in the nature or quality of the compensation for use in such cases before and after termination or recission does not cease because it is made the subject of a decree. And although the wrongdoer may himself be said to be estopped from denying the contract so long as he takes its benefits, his estoppel cannot be made a medium for conferring upon state courts jurisdiction of a subject matter they do not possess. But, as I have shown, we have here no question of copyright. For these reasons Casey's accounting should run until decree shall be entered. *DeBekker* v. *Stokes Co.,* 168 App. Div. 452; opinion on reargument,

172 id. 960; affd., 219 N. Y. 573. As for the other defendants, I see no principle on which they may be held to account either before or after the notice of termination. Although they acquired whatever interests in the plays they may have had subject to the contract between plaintiff and Casey (*Farmers' Loan & Trust Co.* v. *Galesburg,* 133 U. S. 156), they have not assumed and cannot be held to perform any of the covenants of that agreement. *Case* v. *Case,* 203 N. Y. 263; *Anderson* v. *New York & H. R. R. R. Co.,* 132 App. Div. 183. There was no novation, nor can they be held upon any theory of implied promise to pay plaintiff growing out of their use of the films. For the period prior to the notice of revocation they were not wrong-doers, because they were acting as licensees by virtue of Casey's right to assign. It follows that for the period before notice of termination defendants other than Casey cannot be held to any liability. For the period subsequent to February 25, 1916, it would also seem that no relief can be had against these defendants, inasmuch as plaintiffs' right to compel an accounting must depend solely upon their common-law rights, if any. But by copyrighting the stage version of their plays they lost their common-law rights therein (*O'Neill* v. *General Film Co.,* 171 App. Div. 854) and incidentally their common-law rights to the screen production thereof, although under the federal statute the rights of dramatization for the stage and for the screen are separable. *Photo-Drama M. P. Co.* v. *Social U. F. Corporation,* 220 Fed. Repr. 448. Such statutory rights as may have remained, as we have seen, are not involved and could not be enforced in this action if they were. Let findings and a decree be presented in accordance with the foregoing.

Judgment accordingly.