**HAL ROACH STUDIOS, Inc., v. FILM CLASSICS, Inc.**

District Court, S. D. New York.

April 9, 1946.

564

Schwartz & Frohlich, of New York City (Louis D. Frohlich and Herbert P. Jacoby, both of New York City, of counsel), for plaintiff.

Stillman & Stillman, of New York City (David B. Stillman and Sidney H. Levin, both of New York City, of counsel), for defendant.

KNOX, District Judge.

Plaintiff is a producer and defendant a distributor of motion picture photoplays. Prior to 1943, plaintiff granted to Loew's Inc. exclusive rights to the world-wide distribution of certain of its productions, each for a specified term. On August 19, 1943, plaintiff made a contract with defendant, granting it an exclusive license upon speci-

fied terms, to distribute for reissue purposes, a large number of the productions that were then in process of distribution by Loew's Inc. The license so granted, with respect to each photoplay, was to become operative when the same would become available by reason of the expiration of Loew's Inc.'s rights therein.

Among the films covered by defendant's license was the picture "Topper." It, however, was not to be available for defendant's use before July 16, 1947. Being anxious to obtain the right to distribute "Topper" at an earlier date, defendant requested plaintiff to release Loew's Inc. from its obligation to commercialize the film, and to have that corporation relinquish its right to do so.

Plaintiff did as defendant requested, and on July 20, 1944, the present litigants entered into a contract that is now the subject matter of this action. Under this agreement, "Topper" was made immediately available for defendant's use, and the latter paid plaintiff $10,000 as an advance against its share of the gross receipts that would accrue therefrom. The arrangement was that defendant should submit to plaintiff periodical statements of such gross receipts and after defendant had recouped its advance payment of $10,000, it would remit to plaintiff, in monthly installments, 35% of the gross receipts from United States and Canada and 25% of the foreign gross receipts. In the event of defendant's breach of this provision of the agreement, plaintiff was to have the right to cancel the contract and terminate defendant's rights thereunder. The contract, by specific provision therein, is to be construed and interpreted in accordance with the law of the State of New York.

Defendant, as agreed, has regularly, since November 25, 1944, furnished plaintiff with monthly statements of its gross receipts, although there is some dispute between the parties as to what "gross receipts," should comprehend. Defendant, however, has failed to remit moneys admittedly due and owing to plaintiff since a date in January, 1945, at which time defendant had fully recouped the aforementioned advance of $10,000. The excuse offered for the default in making such payments is that

plaintiff has not fully complied with its obligations under the agreement of August 1943, and that plaintiff owed defendant certain moneys which were paid to plaintifl by Loew's Inc., for exhibitions of the "Topper" picture on dates subsequent to July 20, 1944.

Plaintiff now seeks to terminate the contract of July 20, 1944, and to have judgment for the full amount of the royalties due from "Topper," together with interest thereon.

Defendant asks that the complaint be dismissed except for plaintiff's claim for the sum admittedly due it for royalties. Plaintiff's right to recover interest thereon is denied. Defendant also asks for a ruling to the effect that plaintiff is obligated to pay over the royalties which it has received from Loew's Inc., on account of the latter's exhibition of "Topper" on dates subsequent to July 20, 1944. This alleged obligation of plaintiff was originally set up as counterclaim in defendant's answer. At the time of trial, the exact amount of these royalties due from Loew's Inc. could not be established. Proof of such amount, after the establishment of normal conditions in Europe, may possibly become available.

As of January 18, 1946, plaintiff claims it was entitled to receive the sum of $35,-848.48. Defendant admits owing $34,835.-80, except for a possible counterclaim of $874.20. The major issue before the court is as to whether the facts will sustain plaintiff's attempted termination of the contract of July 20, 1944. The dispute between the parties, it would appear, has come about as a result of a clash of personalities. Apparently, it might well have been resolved in conjunction with an arbitration proceeding, now pending between the parties, and which was instituted for the purpose of settling differences that have arisen out of the original contract of August 19, 1943. Be that as it may, those disputes are separate and independent controversies, and so far as this litigation is concerned, are merely incidental.

In my opinion, the issue of cancellation turns upon provisions set forth contained in paragraphs 6(b), 14 and 19 of the contract. They are as follows:

"6(b) The part of the gross receipts payable hereunder to (plaintiff) are hereby irrevocably and unconditionally assigned to (plaintiff) and until the same shall have been paid over to the (plaintiff) shall constitute a trust fund for the sole use and benefit of the (plaintiff)."

"14. If the licensee fails to furnish the licensor with itemized statements required to be furnished hereunder by the licensee, or if the licensee fails to remit to the licensor any sums of money due to the licensor hereunder, in the manner and at the times in this agreement provided for, and should any such default continue for a period of thirty (30) days after notice demanding such performance is sent by registered mail to the licensee, the licensor may, at its election, cancel or terminate this agreement at any time after the happening of any such event * * *"

"19. This agreement and its validity, construction and effect shall be governed by the laws of the State of New York, United States of America."

Since the decision here to be rendered must be in accord with New York law, the construction to be given to the language contained in paragraphs 6(b) and 14 must first be considered.

Plaintiff has established that defendant is in default in remitting accrued royalties, amounting to approximately $35,000, to plaintiff, and further, that such default has continued for more than 30 days since plaintiff, by registered mail, sent notice thereof to defendant, and demanded payment.

A situation much like the present is to be found in the case of Weber v. Mapes, 98 App.Div. 165, 90 N.Y.S. 225, 227, N. Y. Supreme Court, App. Div. First Dept. (not cited by either party).

There, the defendant Mapes, the author of a play, and certain theatrical producers, entered into a contract which gave them the exclusive right to produce Mapes' play in the United States and Canada, in consideration of the payment to the author of $1,000, plus certain royalties. Mapes and the producers, among other things, agreed as follows:

"If the parties of the second part (the producers) shall at any time fail to fulfill any of the conditions set forth in Article Sixth of this agreement (which provides for time and manner in which royalties should be paid), the said party of the first part (Mapes) or his authorized agent, may thereupon by a registered letter addressed to the said parties of the second part to their address, give notice terminating this agreement, and all rights granted or assigned by the said party of the first part to the said parties of the second part shall thereupon revert to the said party of the first part, but without prejudice to any right to compensation or damages, or cause or causes of action that the said party of the first part may or might have in respect to any breach or breaches of this agreement."

The producers exploited the Mapes play but, due to the neglect or failure of their agent, failed to make payments of the agreed royalties or to send statements for a period of only three weeks. Mapes thereupon sent the producers a registered letter purporting to terminate the contract in accordance with the terms thereof. The Appellate Division, speaking through Mr. Justice Patterson, said:

"It is clear, as held at the Special Term, that the defendant was altogether within his right in the course he pursued in terminating the contract. The plaintiffs had arranged with their agent Isaacs, to remit the royalties to the defendant, but Isaacs neglected to do so. His neglect was theirs. It is evident from the terms of the contract that the plaintiffs thoroughly understood what would be the consequences of a failure to remit the royalties. In very precise and exact terms those consequences are stated in the contract."

█ That decision, standing alone, is enough to warrant a decree in favor of the present plaintiff. Not only is it particularly apt, but it is a declaration of the law of the State of New York, but, beyond this, the contract between these litigants makes out a case in favor of plaintiff that is even stronger than the one that was before the Appellate Division in the Mapes suit.

Here, the defendant not only covenanted to pay plaintiff the royalties to which it is entitled on specified occasions, but went so far as to assign them, irrevocably and unconditionally, to the plaintiff, and until actually paid over, they constitute a trust fund for plaintiff's sole benefit. As a result of defendant's failure to carry out its undertakings, it has, in effect, frustrated the object that plaintiff had in mind in entering into the agreement.

Defendant's contention that it was warranted in withholding the royalties by reason of its allegation that plaintiff breached the contract made with defendant on August 19, 1943, must be overruled. Whatever may be the relative rights of the parties as respects that agreement, they are not shown by this record. It follows that I can give no weight whatever to the controversies that are involved in its arbitration proceeding.

█ Unfounded, also, is defendant's contention that it was privileged to withhold the royalties because of a possible setoff or counterclaim against plaintiff, arising out of payments made to plaintiff by Loew's Inc. on account of its showings of "Topper" on dates subsequent to July 20, 1944. Paragraph One (1) of the contract in issue states that notwithstanding the license granted to defendant—"* * * Loew's, Inc. shall also have the right to reserve the privilege of playing off any unplayed exhibition contracts which it may still have in effect in any of the aforementioned foreign countries or other foreign countries."

Furthermore, on July 21, 1944, plaintiff and defendant agreed with Loew's Inc. as follows:

"July 21, 1944

"Charles Schwartz, Esq.,
"Schwartz & Frohlich
"1450 Broadway,
"New York, N. Y.
"Dear Charlie:
"As per our telephone conversation yesterday, it is agreeable to us to have Hal Roach Studios Inc., reissue the motion picture 'Topper' as of July 20, 1944 through Film Classics Inc.

"It is understood that any license that we have granted to this date can be played

out, and if because of war conditions or otherwise some of our offices do not promptly receive our instructions or act upon them, no issue will be raised on account of such distribution after July 20, 1944.

"Will you please have Hal Roach Studios Inc. and Film Classics Inc. sign the enclosed copy of this letter under the word "ACCEPTED" as indicated below, and in returning it to me, will you please let me know to whom and when we are to surrender the negative.

"Very truly yours,
          "Loew's    Incorporated
                    "By J. Robert Rubin
                         "Vice President

"Accepted:
  "Hal Roach Studios Inc.
    "By Hugh Huber Vice Pres.

  "Film Classics Inc.
    "By George A. Hirliman
         "Pres."

From this, it is plain that although plaintiff granted defendant exclusive world wide distribution rights, the parties clearly understood that Loew's Inc. would be permitted to play-out "Topper" exhibitions contracted for prior to July 20, 1944, or before notice of defendant's contract reached Loew's foreign representatives. Furthermore, it seems most unlikely that the parties intended that royalties arising from Loew's play-out exhibitions were to accrue to defendant. It was eager to obtain "Topper" at an early date, and having agreed that such Loew's play-out exhibitions were to be permitted, one is warranted in concluding that it had no real interest in the royalties arising therefrom. At most, these royalties amount to $874.20 and maybe less; an insignificant sum against the sum that defendant owes plaintiff. Had defendant considered itself to be entitled to money from the Loew's showing, it should have made specific provision to receive them, either in its agreements of July 20, or July 21, 1944, respectively.

Black, in his work on "Recission of Contracts and Cancellation of Written Instruments, Second Edition, Volume 2, pages 1278, 1279," says:

"When a right to rescind, reserved to one of the parties in a contract, is made to depend upon the happening of a certain event or contingency, it can be exercised only in the case provided for, not arbitrarily or at the mere will of the party, nor for any other reason than that specified in the contract. And further, a provision of this kind is construed with some strictness. A substantial compliance with the contract by the other party will ordinarily be sufficient to save him from the enforcement of such a provision for recission, since it is something in the nature of a forfeiture. In other words, the precise breach, default, or contingency specified in the contract must be shown to have occurred." (citing Levine v. Field [Sup.], 114 N.Y.S. 819 and Prospect Park & C. I. R. Co. v. Coney Island & B. R. Co., 144 N.Y. 152, 39 N.E. 17, 26 L.R.A. 610). "But on the other hand, if the particular event occurs, it is immaterial how little relation it may appear to have to the substance of the contract, or how unreasonable it may seem to be to make the continued existence of the contract depend on it. If the case arises in which the right to rescind was reserved, that right may be exercised, the parties having so contracted."

The following cases to which the parties have referred, in view of the Mapes case, supra, need but passing attention: Callanan v. Keeseville, Ausable Chasm & L. C. R. R. Co., 199 N.Y. 268, 92 N.E. 747; Raftery v. World Film Corp., 180 App.Div. 475, 167 N.Y.S. 1027; De Mille. Co. v. Casey, 115 Misc. 646, 647, 189 N.Y.S. 275; Giles v. Austin, 62 N.Y. 486; and Breiterman v. Breiterman, 239 App.Div. 709, 268 N.Y.S. 628. In none of them is there reserved a specific right, upon a particular contingency, to cancel the contract there involved.

Plaintiff's argument that the three cases first above cited, particularly the De Mille case, furnish a second basis for allowing it to cancel its agreement with defendant, without regard to paragraph 14 of the contract, is open to grave doubt. The facts in this case, aside from plaintiff's reserved right to terminate its contract with defendant, are not as strong as were those in the

De Mille litigation. Here, Film Classics Inc., at some time, apparently did intend to account fully for the royalties arising from the "Topper" picture. This would depend on its ascertainment of the full extent of claims it might have against plaintiff. While it occasionally made mistakes in computing the "gross receipts," these, for the most part, were readily acknowledged and corrected when attention was called to them. Defendant's books, at all times, were open to plaintiff's inspection, and there is against defendant no proof of fraud. Indeed, with the exception of its non-payment of royalties, and the existance of minor errors in its statements, it has fully performed its contract.

For these reasons, the court need not consider the second basis for termination of the contract that is urged by plaintiff. Suffice it to say, the parties have made no showing that the New York law is otherwise than declared in the Mapes case.

It remains to consider which, if any, of five items here in dispute should be included in the "gross receipts" in which plaintiff is to share. These discrepancies, if such they can be called, were ascertained by plaintiff's accountant in an inspection of defendant's books in September, 1945. The total amount in controversy is $1012.68.

The portion of the contract controlling these matters is as follows:

"6.(a) In consideration of the license and rights herein granted to the Licensee the Licensee hereby agrees to pay to the Licensor the following:

"(i) as an advance against Licensor's share of the gross receipts, the sum of $10,000. by certified check simultaneously with the execution and delivery of this agreement which shall become the absolute property of the Licensor; no part of such sum of $10,000. shall be repayable to Licensee in the event Licensor's share of the gross receipts hereunder shall amount to less than the sum of $10,000.;

"(ii) thirty-five (35%) percent of the gross receipts derived from said motion picture in the United States of America and the Dominion of Canada; and

"(iii) twenty-five (25%) percent of the gross receipts derived from said motion picture in the balance of the world.

"(b) The part of the gross receipts payable hereunder to the Licensor are hereby irrevocably and unconditionally assigned to the Licensor, and until the same shall have been paid over to the Licensor shall constitute a trust fund for the sole use and benefit of the Licensor.

"(c) The term 'gross receipts' as used in this agreement is hereby defined to mean the following:

"(i) with respect to the United States of America, gross receipts shall be deemed to be the amounts paid by exhibitors for the license to exhibit said motion picture in their respective theatres.

"(ii) with respect to all other countries of the world, gross receipts shall be deemed to be the amounts paid by exhibitors for the license to exhibit Topper in their respective theatres, unless the exhibition rights shall be rented outright for the full term of the license for a specified fixed sum of money, in which event with respect to those countries, gross receipts shall be the amount paid to the Licensee directly or indirectly as the consideration for such outright license.

"(iii) all other gross moneys derived from said motion picture in pursuance of the rights granted hereunder, including but not limited to gross moneys derived from the licensing of 16 mm. rights, less the aggregate of:

"(I) the actual cost to the Licensee of positive prints;

"(II) the actual cost to the Licensee of advertising devoted exclusively to said motion picture;

"(III) the actual fair and reasonable cost to the Licensee of re-editing said motion picture; and

"(IV) censorship charges, but without any other deductions, diminution, or offset of any nature of any other amounts.

"(d) All charges and expenses other than those specifically mentioned in subdivision (c) of this paragraph 6 shall be borne solely by the Licensee and no part

thereof shall be chargeable against the Licensor or deductible from said amounts paid by exhibitors, sub-distributors or others.

"(e) Moneys derived from sales of accessories shall not be included in gross receipts and the cost thereof shall not be deducted from gross receipts."

■ In this phase of the case, the court, in dealing with these items, will be governed so far as is possible by the provisions of the contract. The matters not specifically covered thereby will be governed by evidence having to do with customs and usages in the trade.

■ As to income from "trailers" received by defendant in the amount of $481.-83 from National Screen Service, the question is, whether this item should be considered as an accessory under paragraph 6, subsection (e), or advertising under paragraph 6, subsection (c), subdivision (II), or included in "all other gross moneys derived from said motion picture," under paragraph 6, subsection (c), subdivision (III). The word "trailers" is nowhere mentioned in the contract. The evidence is that trailers were used to advertise "Topper" as a coming attraction, and incorporated therein were scenes taken from the motion picture itself. The custom of the trade is to treat trailers as advertising for which there may be either a cost incurred or an income derived by the distributor. In my opinion, these trailers - should be treated as advertising, for which, had there been a cost incurred, could have been deducted from gross receipts. To be consistent, in the event a profit is earned, as in this instance, the same should be included in "gross receipts." Plaintiff is accordingly entitled to its proportionate share of $481.83.

■ Plaintiff's right to a share of the $3,000 down payment received by defendant from the Canadian territory will be denied. This money is merely an advance to defendant under a contract for the delivery of nine photoplays, of which "Topper" is only one, and which sum must be returned by defendant in the event deliveries of the pictures be not made. This has been the customary procedure, and the instant contract does not provide otherwise. Of course, upon consummation of the Canadian territory contract, defendant must credit this payment to gross receipts, and plaintiff ultimately will be entitled to its share of the money.

■ The $82 checking charge, and $45.-61 commission paid to Sam Wheeler, in my opinion, are non-deductible from the "gross receipts." These items fall within the terms of the contract, paragraph 6, (c); "but without any other deduction, diminution, or offset of any nature of any other amount." It matters not that such may be customary deductions of the trade. As respects them, the contract is controlling.

For like reason, the commission of $2211 paid to Barnstyn is a non-deductible item under paragraph 6(c) of the contract. The record shows that although Barnstyn would testify, had he appeared as a witness, that he was an independent contractor, the contract under which this sum was paid him was between defendant and Film Sales, Ltd. of London. The facts, therefore, indicate that the payment was made to Barnstyn as an agent of defendant. Such a sales commission is an expense that must be paid by defendant and no provision in the contract permits its deduction from gross receipts.

■ As to the deduction of $454.35 from foreign gross receipts and $65.56 from domestic gross receipts for the making of Spanish and Portuguese titles and trailers, I conclude that such are items of fair and reasonable cost incurred in reediting said motion picture. They are deductible under paragraph 6, subsection (c), subdivision (iii). Plaintiff, therefore, should not share therein.

The question of defendant's liability for interest on the sums wrongfully withheld from plaintiff remains. Under the contract, the law of the State of New York, allowing interest at the rate of 6%, must be followed.

Section 480 of the New York Civil Practice Act provided in part as follows:

"In every action, wherein any sum of money shall be awarded by verdict, report

or decision upon a cause of action for the enforcement of or based upon breach of performance of a contract, express or implied, interest shall be recovered upon the principal sum whether theretofore liquidated or unliquidated and shall be added to and be a part of the total sum awarded."

This statute makes no distinction between actions at law and actions in equity. The question of interest is a matter of local law and the courts of the state and the federal courts sitting within a particular state should be in harmony upon this point, Rigopoulos v. Kervan, D.C.S.D. N.Y., 1943, 53 F.Supp. 829; Massachusetts Benefit Association v. Miles, 137 U.S. 689, 11 S.Ct. 234, 34 L.Ed. 834; Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, and

Section 480 of the Civil Practice Act is mandatory. McLaughlin v. Brinckerhoff, 222 App.Div. 458, 226 N.Y.S. 623.

It follows that plaintiff's termination of the contract must be held to have been justified, and it may have judgment for royalties presently due, together with interest thereon, with this exception: Interest shall not run on the sum of $34,835.80 from the day of trial when this amount was tendered plaintiff and refused.