**UNITED STATES PLYWOOD CORP. v.
HUDSON LUMBER CO. et al.**

United States District Court
S. D. New York.

June 30, 1953.

530

Krause, Hirsch, Levin & Heilpern, New York City, Sydney Krause and Raymond T. Heilpern, New York City, of counsel, for plaintiff.

Austrian & Lance, New York City, for defendants.

DIMOCK, District Judge.

In this action, United States Plywood Corporation, which I shall call "Plywood", sues Hudson Lumber Company and Eagle Pencil Company, which I shall call "Hudson" and "Eagle" respectively, to recover $193,180.65 alleged to be due for cedar logs sold and delivered by Plywood to Hudson under a contract guaranteed by Eagle. The answer of Hudson and Eagle contains a counterclaim for rescission of the contract.

Plywood has made this motion for summary judgment striking out that counterclaim pursuant to Rule 56, F.R.C.P., 28 U.S.C.A.

The counterclaim asks rescission of the contract on two alternative grounds: first, that Hudson entered into it under a mistake as to the proper construction of the provisions for fixing the price of the logs and that Plywood was guilty of certain unrelated breaches so that there arose a right of rescission, and second, that if Hudson was correct as to its construction, Plywood's insistence upon payment according to the incorrect construction plus the unrelated breaches of the contract gave rise to a right of rescission.

The motion is based upon the position that any right of Hudson to rescind has been lost by delay and acts of affirmance of the contract for a long period after knowledge of all of the alleged grounds for rescission except those too trivial to be significant.

The contract was dated December 9, 1947. It called for the sale and delivery by Plywood to Hudson of all the merchantable cedar logs to be derived by Plywood from a tract of about one billion feet of timber in the State of California, known as the LaTour Timber, and the payment therefor by Hudson of Plywood's cost of such logs, as defined in the contract, plus 10% of such cost. A time limit of 25 years was fixed by the contract.

The LaTour Timber consisted of pine and fir besides the cedar. The contract recited that all of the timber was to be

cut at the same time and the logs of all three kinds delivered at substantially the same point, the cedar for Hudson and the pine and fir for Plywood. It provided in substance that, of the cedar logs, only those which scaled 50% merchantable should be delivered.

The definition of cost included "logging costs" and provided "logging costs * * * shall be computed on a common cost per M ft. for all species derived from the La-Tour timber and this common cost will be the cost per M ft. of cedar logs delivered to Hudson hereunder."

A few months after the signing of the contract and before any logs had been delivered a controversy arose over the interpretation of this definition which is the basis of Hudson's plea for rescission on the ground of mistake. Plywood contended that the common cost should be divided in proportion to the gross footage delivered of each of the three kinds of logs while Hudson and Eagle contended that the apportionment should be according to the net merchantable footage delivered of each. This makes a substantial difference because there is a larger unmerchantable content in the average cedar log than in the average pine or fir log. Thus if the logging cost were apportioned according to the merchantable footage in each log delivered to the common destination instead of the total footage in each log delivered there, the cedar would bear a much smaller part of it.

The contract provides for tentative monthly billings and the monthly bills have been rendered on the gross footage rather than the net footage basis. Costs are to be finally determined, the contract directs, at the close of each calendar year by Arthur Andersen & Co., certified public accountants. "Determination of cost of logs by said certified public accountants shall be final and binding upon the parties hereto."

Arthur Andersen & Co. determined the cost for the period ended December 31, 1948, on the gross basis contended for by Plywood, arriving at a figure of $58,163.-32. They used the same basis for the years 1949, 1950 and 1951 and Plywood used it in the tentative billings for 1952, giving the following as Plywood's calculation of cost plus 10% to December 31, 1952.

| Arthur Andersen & Co. | report | 6 mos. | ending | 12/31/48 | $58,163.32 |
|---|---|---|---|---|---|
| "        "        "    "        " | | yr. | ending | 12/31/49 | 182,084.07 |
| "        "    "        " | | yr. | ending | 12/31/50 | 210,720.84 |
| "        "    "        " | | yr. | ending | 12/31/51 | 198,149.47 |
| Plywood estimate | | yr. | ending | 12/31/52 | 175,825.33 |
| | | | | | $824,943.03 |

Hudson has steadfastly maintained throughout that the net basis should be used. It claims to have learned in May, 1949 from Arthur Andersen & Co. that their first calculation had been on the net basis and that Plywood had induced them to change it to the gross basis.

In August, 1949, Hudson brought an action against Plywood in the Superior Court of California for a declaratory judgment construing the contract and for an injunction against the compelling of arbitration by Plywood pursuant to the provisions of the agreement. In the complaint Hudson stated "Plaintiffs [Hudson and its affiliate Elkins Sawmill, Incorporated] are ready, able and willing and hereby offer to do equity, and perform the contract as the same may be interpreted by the Court herein."

That action was removed to the United States District Court for the Northern District of California and then stayed pending arbitration under a mandatory arbitration provision of the contract. The order staying the action was affirmed by the Court of Appeals on May 5, 1950, 181 F.2d 929.

In March 1951 Hudson demanded arbitration and on November 5, 1951, a ma-

532

jority of the arbitrators handed down an award as follows:

"1. That the theory and basis of cost accounting as followed in the audits and reports of Arthur Andersen & Co. for the years 1948 and 1949 are pursuant to the proper construction of the contract of December 9, 1947.

"2. That Hudson is entitled to a credit for payment to Plywood under the contract for incense cedar logs delivered to October 31, 1950, which logs were not properly scaled as 'merchantable' under the contract, said credit being the sum of Thirty-Four Thousand, Seven Hundred And Fifty-Seven Dollars And Seventy Cents ($34,757.70)."

Hudson moved in the Superior Court of California to vacate this award. Plywood pressed for payment pending the determination of this motion but Hudson's lawyer replied on October 3, 1952, that a final settlement could not be made until further proceedings had "determined with finality the proper basis of costing." He added: "The record clearly establishes that our client has not been dilatory in this matter in any respect, but has from the first sought a final determination of the proper method of costing so that payment of due bills could be made promptly."

■ The motion to vacate the award was denied and the award confirmed in January 1953. Hudson has appealed this decision and the appeal is now pending undetermined. Under California law, the award is not res judicata until the appeal has been disposed of. Robinson v. El Centro Grain Co., 133 Cal.App. 567, 24 P. 2d 554.

The instant action was brought on January 9, 1953, to recover $193,180.65 calculated as follows:

| | | |
|---|---|---|
| Plywood's total billings to defendants as above | | $824,943.03 |
| Hudson's payments on account | $597,004.68 | |
| Credit as allowed in arbitration | 34,757.70 | 631,762.38 |
| | | $193,180.65 |

On February 27, 1953, Hudson and Eagle served their answer containing the counterclaim for rescission which is the subject of the present motion.

This was the first claim made by them for rescission although the controversy as to construction had arisen in the summer of 1948 and had been determined adversely to them by Arthur Andersen & Co. when they fixed the amount of the 1948 costs. Payments on account were made during all that time and deliveries have been accepted as late as March 1953 after the interposition of the counterclaim for rescission.

In October, 1952, Hudson specifically invoked "subparagraph (f) of paragraph 3 of the agreement of December 9, 1947" as authority for a request that Hudson temporarily discontinue cedar log deliveries. That provision permitted the deferring of falling of cedar trees "to permit adjustment of the in-put of logs to the productive capacity of [Hudson's] mill, until such time as the quantity of standing cedar, the cutting of which has been deferred, aggregates 3,000,000 feet and no more." Hudson had the right and duty to log and remove that cedar at its own expense.

Plywood in making roadways to get out the pine and fir in that tract cut cedar trees in spite of this request for deferral and delivered 250,000 feet thus produced. Francis M. Neall, Hudson's general manager, wrote Plywood on February 11, 1953, "I would appreciate it if you would confirm to us that the delivery of this 250,000 feet of cedar logs will not be charged against the 3,000,000 feet which we have a right to defer under the contract." Nevertheless Neall in an affidavit filed in opposition to this motion asserts that the delivery of the 250,000 feet was a violation of the contract and the counterclaim cites it as one of the breaches giving rise to the right of rescission.

By rescission Hudson seeks to be relieved of the contract from the date of the judgment and to be allowed to adjust its past obligations by paying for all the cedar logs received the fair market value. This is said to be a substitute for the return of the logs themselves which would give Plywood the option to buy similar logs or to keep the money, whichever it preferred. Hudson's insistence on rescission even if the court construes the contract in its favor indicates that its proffered payment of market value would involve a payment of even less than the cost computed under the construction of the contract for which Hudson contended.

Since Hudson claims this right to rescind whatever may be the correct construction of the contract it has no justification for waiting for such a construction before seeking rescission.

Even if we consider defendants' two bases for rescission separately, however, instead of in conjunction, defendants are in no better case.

██ Defendants' principal ground is an alleged mistake. This must be a unilateral mistake since if both parties had the same intention and made a bilateral mistake as to its expression in the contract that would lead only to reformation and defendants do not seek reformation.

██ Rescission for a unilateral mistake is rarely granted and then only when the suitor moves with the utmost promptness. Indeed Professor Williston states the rule, Williston on Contracts (Rev.Ed) § 1580,

"The same principle that prohibits recovery of money paid after the defendant has changed his position makes it clear that whatever equity there may be in favor of one who has made a unilateral mistake in the formation of a bilateral contract, the effect of it is confined to cases where the transaction is still wholly executory. Therefore, if the parties proceed with a contract under a bid or offer erroneously calculated, there can be no relief; and in other cases also unilateral mistake will not justify rescission of a wholly or partly executed contract."

Instead of rescinding when the contract was executory, Hudson has continued for over four years to accept deliveries and thus, as it claims, put upon Plywood the risk of a drop in the market value of the logs. It has demanded and had set apart for itself trees containing the 3,000,000 feet of cedar for which, under the contract, it need not pay the logging costs. A return of the trees to Plywood will not make Plywood whole for, having left the trees for Hudson when it took out the pine and fir, Plywood would be faced with an expensive second bite at the cherry in getting out the cedar.

██ There is no question of fact presented with respect to the delay in seeking rescission or with respect to the acts of affirmance occurring since the controversy about construction arose in 1948. Cf. Colby v. Klune, 2 Cir., 178 F.2d 872. In the light of this delay and these acts of affirmance Hudson and Eagle are not entitled to assert their counterclaim for rescission insofar as it is founded on mistake.

Indeed even if defendants were seeking rescission on one of the grounds for which it is more freely granted such as fraud, such conduct as here appears would preclude it. Grymes v. Sanders, 93 U.S. 55, 62, 23 L.Ed. 798; Rothschild v. Title Guarantee & Trust Co., 204 N.Y. 458, 464, 97 N.E. 879, 41 L.R.A.,N.S., 740; Restatement of the Law of Contracts, § 484; Brennan v. Nat. Equitable Investment Co., 247 N.Y. 486, 489, 160 N.E. 924, reargument denied 248 N.Y. 560, 162 N.E. 524; J. J. Little & Ives Co. v. Lamb Pub. Co., 108 Misc. 14, 177 N.Y.S. 265; Stevens v. Bryson, 135 Cal.App. 684, 27 P.2d 932, 933; Fabian v. Alphonzo E. Bell Corporation, 55 Cal.App.2d 413, 130 P.2d 779, 781.

My conclusion with respect to mistake, however, is not quite determinative of the counterclaim insofar as it is founded on breaches of contract by Plywood. The breaches are alleged to have occurred at different times many of which were long after the date when the construction controversy first arose so that claims for rescission based on them are not faced with quite as overwhelming an accumulation of

delay and acts of affirmance as in the case of the claim for rescission based on mistake. The effect of the delay and acts of affirmance on the claims based on breaches must, therefore, be considered separately.

■ While the delay and acts of affirmance are not heaped up so high against rescission based on the alleged breaches as against rescission based on the alleged mistake, the breaches here assigned involve much less serious matters than the construction of the cost provisions of the contract upon which the claim of mistake is based. The rule is that a breach will not justify rescission unless it substantially defeats the object which the parties intended to accomplish. Rosenwasser v. Blyn Shoes, Inc., 246 N.Y. 340, 346, 159 N.E. 840; In re Waterson, Berlin & Snyder Co., 2 Cir., 48 F.2d 704, 709; Murphy v. Sheftel, 121 Cal.App. 533, 9 P.2d 568, 571.

With these principles in mind I will take up the breaches charged by Hudson and Eagle.

■ They assign as a breach Plywood's insistence on payment under Plywood's interpretation of the contract. True, such insistence would be unjustified on the hypothesis that the net footage basis is the correct one. Nevertheless it cannot be a basis for rescission. It was not within Plywood's power to force settlement on that basis and, indeed, Hudson and Eagle say that they have made their payments on the net footage basis so that Plywood's demands, far from defeating the object of the contract, have not even harmed them.

■ Perhaps more serious is the charge that Plywood induced Arthur Andersen & Co. to prepare cost computations different from those that they had independently arrived at and that the accountants "based upon the inducement of the plaintiff * * * wrongfully and illegally exceeded their functions as accountants and wrongfully and illegally failed to act as impartial and neutral accountants." Hudson's general manager was told that story as early as May 1949 and in the summer of 1951 he told it to the arbitrators who nevertheless found that Arthur Andersen & Co.'s application of the gross footage basis was cor-

rect. The claim cannot be made a ground for rescission after a lapse of so much time.

■ Another claim now urged as a rescission-justifying breach and which was a subject of the arbitration proceedings is the claim that logs containing less than 50% of merchantable cedar were delivered. It will be recalled that the arbitrators awarded $34,757.70 as a credit on account of such deliveries. Even if the award had not been made it would be too late to apply for rescission based on deliveries made before the summer of 1951. Hudson and Eagle say, however, that the deliveries of unfit logs have continued and through 1952 have amounted to 6% of the total net scale. That is not enough to defeat the object of the contract, particularly where, under the contract, Hudson and Eagle do not have to pay the cost of such non-merchantable logs.

■ Another alleged rescission-justifying breach is failure to scale the logs properly. This claim was made in the 1951 arbitration proceedings and Hudson's general manager testified that there had been no material claim on that ground after June 19, 1951. It is now said, however, that the trouble has recurred. Much as in the case of non-merchantable logs, that is not enough to defeat the object of the contract where, as here, it is open to Hudson to do its own scaling on delivery.

■ I have referred above to the claim that the contract was violated by Plywood's delivery of 250,000 feet of logs out of a stand that Hudson had designated as part of the 3,000,000 feet which it might defer. Even if Hudson's claim be accepted, the violation was not serious.

■ Another rescission-justifying breach assigned by Hudson and Eagle is the inclusion in logging costs on all three kinds of trees of about $5,000 for chunk scale. Chunk scale is the amount that one who is paying a stumpage charge for timber as he removes it must pay the land owner for logs left in the woods which should have been removed and paid for. No claim for any such breach was ever made prior to the filing of the answer. The

amount of the chunk scale was fixed by joint scalers whose decision was made binding on Hudson and Eagle by the contract of December 9, 1947. By including $5,000 of chunk scale in the claimed apportionable cost Plywood did not defeat the object of the contract.

■ Hudson claims that the trees were felled negligently so that broken and sprung logs have been delivered. No such charge was made in the arbitration proceedings. The general manager in his replying affidavit does no more than present the conclusion: "The volume of such damaged logs was not great but the danger and inconvenience caused by their delivery is great." Again the object of the contract is not defeated.

As appears above, the decision of joint scalers under the stumpage contract as to the stumpage charge was binding on Hudson and Eagle as well as Plywood. Hudson and Eagle assigned as a breach the failure of Plywood to assert their rights to proper scaling. Plywood's president, in his affidavit, called attention to the testimony of Hudson's general manager in the arbitration proceedings that Plywood was doing everything it could to resolve the differences in scaling. The general manager in his replying affidavit made no attempt to support this assignment.

Another charge that Hudson and Eagle made no attempt to support when it was attacked by Plywood was the charge that Plywood had failed to accord Hudson and Eagle, as required by paragraph 3 of the contract, opportunity to participate in the annual hearings with Arthur Andersen & Co. on the determination of cost. In opposition Plywood cited actual participation in, or opportunity to participate in, the hearings held for the 1948, 1950, and 1951 statements.

■ Counsel for Hudson and Eagle say that the various grounds for rescission should not be weighed separately but that the question is whether their cumulative effect is such as to require rescission. That is, of course, true but all of the grounds for rescission cannot coexist under all circumstances. The requested finding of the existence of a unilateral mistake would involve a finding that the contract, properly construed, called for computation on gross footage. In that event none of the various acts of Plywood in attempting to collect on that basis could be deemed to be breaches. The other breaches assigned when considered with the assumed mistake do not warrant rescission of the contract in the light of the length of time that elapsed before the claim of rescission, the acts of affirmance of the contract and the rule that breaches to be ground for rescission must defeat the object of the contract. The breaches assigned are no more than the difficulties and disputes that must be expected in operations of this size and they may be fully compensated for by damages if the parties cannot arrive at the adjustments that are usually agreed upon by businessmen in such cases.

My holding, that rescission would not be required by a finding of mistake plus the assigned breaches other than the demands for performance on the gross footage basis, practically disposes of the motion. It is true that demands for performance on the gross footage basis would not have been justified if the court should ultimately find that the proper construction of the contract required the application of the net footage basis. That, however, would mean that no mistake had been made so that the assigned breaches would have to stand alone as ground for rescission. They would be insufficient to serve as that ground.

The motion for an order striking out defendants' separate and complete affirmative defense and counterclaim and granting summary judgment on defendants' counterclaim is granted.