**Eleanor HOLM, Plaintiff,**

v.

**Morris SHILENSKY, Arthur Cantor, and Charles Wohlstetter, as Executors of the Estate of Billy Rose, Deceased, Defendants.**

**No. 66 Civ. 3465.**

United States District Court
S. D. New York.

June 12, 1967.

Harry H. Lipsig, New York City, Sinclair, Barfield & Louis, Miami, Fla., for plaintiff; Murray L. Lewis, New York City, of counsel.

Hays, St. John, Abramson & Heilbron, New York City, for defendants. Osmond K. Fraenkel, James R. Cherry, New York City, of counsel.

WYATT, District Judge.

This is a motion by defendant executors of the late Billy Rose for judgment on the pleadings dismissing the six causes of action pleaded in the amended complaint (Fed.R.Civ.P. 12 (c)) or in the alternative for summary judgment in their favor (Fed.R.Civ.P. 56).

The plaintiff (Eleanor) was at one time the wife of Billy.

The complaint asserts that there is diversity of citizenship. It is averred that Eleanor "resides" in Florida. This, of course, is no proper averment of citizenship. Eleanor may reside in Florida and be a citizen of some other State, as is undoubtedly the case of many Florida residents. The executors are said to have been appointed by the Surrogate's Court of the County of New York. This also is no proper averment of citizenship. It is the citizenship of the executor which is con-

trolling, and not the State of his appointment. For purposes of this motion, however, it is assumed that Eleanor is a citizen of Florida, that defendants are all citizens of New York, and that there is jurisdiction under 28 U.S.C. § 1332.

The amended complaint (not required to be verified and not in fact verified) contains six separately stated claims. Trial by jury is demanded.

The first claim avers that Eleanor and Billy were married, that they made a "separation agreement" dated December 28, 1953, that Billy induced Eleanor to enter into the separation agreement by false representations that he would "give to her" under the agreement two certain paintings by Renoir, that Billy falsely represented that he owned the two paintings and that they were "genuine Renoir" and were worth about one million dollars, that Billy knew that the two paintings were not in fact by Renoir, that Eleanor was induced to enter into the separation agreement by the false representations, that she accepted the two paintings as "partial consideration" for entering into the agreement "with the intent and purpose" that the two paintings would be in lieu of her right of election (Decedent Estate Law, McKinney's Consol.Laws, c. 13, § 18), that Eleanor also relied on the false representations and believing that she had received two paintings by Renoir worth one million dollars which "she could use in her later years for her living expenses" she secured a divorce from Billy, that she gave up her right of election in reliance on the false representations, and that she has thereby been damaged to the extent of $15,-000,000. The theory of this first claim appears to be that if by fraud she had not been induced to give up her right of election and to obtain a divorce, she would now have such right of election and her share of Billy's estate would be worth fifteen million dollars; she claims that this is the amount of her damage from the fraud.

The second claim is based upon the same false representations but avers that Eleanor accepted the two paintings in place of other property jointly owned by her with Billy, that the two paintings are worth about $10,000, and that she has been damaged in the sum of $990,-000 (difference between the represented value of $1,000,000 and the actual value of $10,000).

The third claim is based upon the same false representations but avers that Eleanor by the agreement accepted $200,000 as a marital property settlement and that she has been damaged in the sum of $990,000.

The fourth claim is based upon the same false representations but avers that Eleanor was induced thereby to enter into the separation agreement and that she has been damaged in the sum of $990,000.

The fifth claim is based upon the same false representations but avers that Billy knew they were false or made them with "careless and reckless disregard" and without any reasonable grounds to believe that they were true. The same $990,000 damage figure is claimed.

The sixth claim is not based on false representations but avers that Eleanor and Billy made a "mutual mistake" as to the genuineness of the two supposed Renoir paintings, that she executed the separation agreement and secured a divorce from Billy in reliance on the mutual mistake, that her position has been altered and she has suffered "irreparable damage", and that she has been damaged in the sum of $990,000.

The answer pleads seven complete affirmative defenses (Fed.R.Civ.P. 8(c)) to each of the six claims. The affirmative defenses are as follows:

First: failure to state a claim upon which relief can be granted;

Second: a six year statute of limitations;

Third: the provision in the December 28, 1953 agreement that the two paintings "shall be retained" by Eleanor, she having been theretofore in possession of them;

Fourth: the provision in the December 28, 1953 agreement expressly disclaiming any representations to induce its execution;

Fifth: the provision in the December 28, 1953 agreement by which Eleanor released all claims against Billy or his estate;

Sixth: the New York judgment of separation; and

Seventh: the Nevada decree of divorce.

The facts which appear without any dispute are as follows:

Billy and Eleanor were married on November 14, 1939. Shortly thereafter —in 1939 or 1940—they began living in a town house at 33 Beekman Place, title to which was apparently in Billy.

In the bedroom of Eleanor when they first lived in the house was a picture by Toulouse-Lautrec hanging over the fireplace. Eleanor did not like it; therefore, a large oil painting of a nude woman was substituted in its place. This was in 1940 and from the same period a small oil painting of a lady's head was on the bureau in Eleanor's bedroom. The large nude and the small head each had the name "Renoir" on the painting or on the frame. They had been bought by Billy, but whether before or after the marriage does not appear. The large nude and the small head remained always (except during summer absences, when they were put in a cellar safe) in Eleanor's bedroom from 1940 until she removed them in early 1954 as a result of events to be described.

In 1951 Eleanor and Billy separated, she being then in sole possession of the town house and its contents, and remaining in occupancy. In the same year Eleanor brought an action for separation against Billy in the Supreme Court, New York County. This action duly came on and was tried before Mr. Justice McNally who ruled that Eleanor was entitled to a judgment of separation.

Eleanor and Billy were each represented by able and outstanding counsel.

Counsel for Eleanor at that time is not the same as the able and outstanding counsel acting for her in the case at bar.

Before the judgment of separation was made Eleanor and Billy, each with the assistance of counsel, negotiated an alimony and property settlement agreement, the stated purpose of which was "to render unnecessary a trial to determine the reasonable alimony to be paid" to Eleanor and "to agree upon an amount to be paid" to Eleanor "as a marital property settlement to settle their present and future property rights". The parties executed a carefully prepared and detailed agreement dated December 28, 1953 and duly acknowledged their execution on the same date. This is the agreement referred to in the amended complaint (and sometimes by movants) as the "separation agreement" but it is not really correct to describe it as such; rather it is an agreement settling all alimony and property matters in contemplation of a judgment of separation to which the court had already found Eleanor entitled.

The December 28, 1953 agreement had these principal provisions:

1. Billy agreed to pay to Eleanor permanent alimony of $30,000 per year beginning in 1954 and continuing until the death of Eleanor, or the death of Billy, or the remarriage of Eleanor after a divorce from Billy.

2. Billy agreed to pay to Eleanor $200,000 in ten annual instalments "as a marital property settlement", and to put up security for such payment.

3. Eleanor agreed promptly "to vacate" 33 Beekman Place "and surrender possession" to Billy.

4. They agreed that "all furniture, furnishings, household effects and other articles located at 33 Beekman Place * * * *except for the articles listed* * * *in Schedule 'D'* * * *hereto*, constitute and remain the sole * * * property" of Billy "and shall be surrendered to him" (emphasis supplied).

5. They agreed that "the articles listed * * * in Schedule 'D' shall be *retained*" by Eleanor "and shall constitute and *remain* the sole and exclusive property" of Eleanor (emphasis supplied).

6. They agreed to apply promptly to the Supreme Court, New York County, for a final judgment of separation and declared their intention to ask jointly that the agreement be incorporated in that final judgment.

Schedule D listed the articles which were to "remain" the property of Eleanor. It sets out the articles under their then room location at 33 Beekman Place. They were of all sorts and kinds, used for living in or decorating a home. Among them, distinguished in no way by manner of listing from the other articles were the two paintings here involved, described under "Mrs. Rose's Bedroom" as follows:

"Nude in manner of Renoir—oil painting"

"Small Renoir—oil painting" .

The two pages of Schedule D were initialed by Eleanor and Billy.

The December 28, 1953 agreement was obviously entered into upon an understanding (not expressed directly in the agreement) that Eleanor would promptly establish a Nevada residence and sue for absolute divorce there. The agreement provided that if Eleanor and Billy were still married on April 10, 1954, in that event the terms of the agreement were no longer binding, but that if there were a divorce by that date then the terms of the agreement were to "continue in full force and effect" and a further principal provision became effective:

7. All claims of any kind which Eleanor had against Billy, or he against her, were released and they each gave up any interest in the property or estate of the other, including the right of election to take against the will of the other (Decedent Estate Law, § 18).

Finally the agreement contained an important provision, of significance to the present motion. There was an express declaration by each party that "no promises, warranties or representations of any character or nature have been made to induce either party to enter into this agreement". On the page containing this declaration appear the initials of Eleanor and Billy. They placed their initials on each page of the agreement.

The judgment of separation was signed by Mr. Justice McNally on January 6, 1954. The December 28, 1953 agreement was expressly incorporated in this judgment. Eleanor and Billy each in person signed and consented to the entry of this judgment; their respective counsel did likewise.

Eleanor did promptly establish a residence in Nevada and on February 27, 1954 a decree of divorce of Eleanor from Billy was made by the District Court for Clark County, Nevada, on an appearance of Billy through counsel. This decree expressly approved as a "Property Settlement Agreement" the December 28, 1953 agreement, expressly made it a part of the decree, and ordered the parties to comply with its terms.

Eleanor removed the Schedule D articles (including the two paintings) from 33 Beekman Place and surrendered to Billy the house and the articles there remaining.

So far as appears, Billy performed everything required of him under the December 28, 1953 agreement.

Billy died on February 10, 1966. The present defendant executors were appointed temporary executors of his estate.

This action was commenced on October 19, 1966.

Billy's will (dated November 22, 1965) and a codicil (dated February 7, 1966) were admitted to probate in New York County on October 27, 1966 and letters were duly issued to the movant defendant executors.

The amended complaint was filed December 20, 1966.

## A.

The sixth claim should be discussed first because it is based on a theory entirely different from the other five fraud claims.

The sixth claim is based on a "mutual mistake" of Eleanor and Billy in believing that the two paintings were by Renoir and were worth one million dollars whereas in fact they were by an unknown artist and worth ten thousand dollars. Eleanor asks money damages for the difference.

■■ But if the mistake were "mutual", why should Eleanor have any damages against one just as innocent (by hypothesis) as she? It must be clear that there can never be money damages for a contract induced by a mutual mistake. Rescission of the contract or its reformation might in some circumstances be just, but never money damages. If Billy were under the same mistake as Eleanor, what wrong did he do her? He broke no contract; he committed no tort. If Eleanor were asking to rescind the contract for mutual mistake of fact, the action would be one familiar to equity. But there is no cause of action, at law or in equity, such as is attempted to be stated in the sixth claim. United States Plywood Corp. v. Hudson Lumber Co., 113 F.Supp. 529, 533 (S.D.N.Y.1953), appeal dismissed, 210 F.2d 462 (2d Cir. 1954); Sheridan Drive-In, Inc. v. State, 16 A.D. 2d 400, 228 N.Y.S.2d 576, 582 (4th Dept. 1962); 3 Corbin on Contracts § 608.

## B.

The first five claims are all based on alleged fraudulent representations of Billy, inducing Eleanor's execution of the December 28, 1953 agreement.

That agreement has, however, become part of a decree of a Nevada court which admittedly had jurisdiction over both parties. The Nevada court ordered compliance with its terms.

■ No action can be maintained in New York for fraud in respect of an agreement incorporated in and approved by a decree of divorce of a sister State.

Weintraub v. Weintraub, 302 N.Y. 104, 96 N.E.2d 724 (1951); Klotz v. Klotz, 17 A.D.2d 800, 232 N.Y.S.2d 753 (1st Dept. 1962); Fry v. Fry, 279 App.Div. 122, 108 N.Y.S.2d 227 (1st Dept. 1951) affirmed 304 N.Y. 889, 110 N.E.2d 501 (1953); Matthews v. Dench, 279 App. Div. 866, 110 N.Y.S.2d 908 (1st Dept. 1952).

## C.

■ The contract declared, over the signature of Eleanor, that there were no representations to induce her execution of the agreement. This is not an action for rescission. The contract stands. So long as the contract stands, Eleanor is conclusively bound as a matter of law by its declaration that there were no such representations as she now claims. Such is the general rule, that the contract declarations are "conclusive" until and unless the contract has been set aside by a court "on grounds of fraud or mistake, or on some ground that is sufficient for setting aside other contracts". 3 Corbin on Contracts § 403.

The decision in Sabo v. Delman, 3 N. Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957) is not to the contrary because that was an action to rescind the agreement, a point of distinction much emphasized in the majority opinion.

It may be that in later New York decisions, such as Danann Realty Corp. v. Harris, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959) and Crowell-Collier Publishing Co. v. Josefowitz, 5 N.Y. 2d 998, 184 N.Y.S.2d 859, 157 N.E.2d 730 (1959), the Court of Appeals of New York overlooked the critical distinction between an action for money damages (affirming the contract) and an action to set aside the contract for fraud in the inducement.

■ In any event, there can be no doubt that New York law would not permit a plaintiff to aver or prove fraudulent representations inducing an agreement when that agreement expressly declared that there were no such representations, when each party had independent legal advice, when each party believed

the agreement "fair, just and reasonable", when each signed "freely and voluntarily", and when the agreement was then expressly approved by, and incorporated in, a judgment of a sister State. The authorities already cited under B above, so establish.

### D.

Thus far matters of law have been discussed.

But it is clear that there is no genuine issue as to the material fact of the representations claimed, and that in fact there were no such representations by Billy and no reliance by Eleanor.

It is established that at the time of the agreement the two pictures had been hanging in Eleanor's bedroom for at least 13 years and had been in her possession adverse to Billy for at least 2 years. She knew the pictures as well as, if not much better, than he did. From all that appears she knew as much about paintings as he did. In any event, in the art center which New York is, she did not rely, and could not reasonably rely, on representations by Billy as to the paintings. If the matter of the two paintings was of any importance to her (which it obviously was not), it was up to her to solicit opinions from the many available experts; she could not reasonably rely on statements by one not expert.

It is also clear that the concept at the time of the agreement was that Eleanor was *keeping* the two pictures, which she already had had for years, and definitely *not* that Billy was then *giving* her the two paintings for any purpose.

The manner in which the two paintings are set out in Schedule D shows that they had no such importance as is now claimed for them. They are not treated in a fashion different from "ashtrays and knickknacks" or "Christmas tree ornament."

Moreover, as to one of the paintings, the nude, it is described in Schedule D as "in manner of Renoir", which is a specific disclaimer that it is by Renoir.

But the most important fact is that Eleanor was represented by astute, sophisticated counsel. It is not conceivable that her counsel, himself wise and experienced in matters artistic, would have permitted her to rely on representations by Billy as to the genuineness or value of any oil paintings, Renoir or otherwise. At the time of the execution of the agreement, moreover, counsel for Eleanor had concluded (rightly or wrongly) that Billy was not worthy of belief and had indeed been concocting fictitious stories and making false charges over the then past several months. The details—and an account of the vigorous, careful and successful representation of Eleanor—have been given in a widely read book published by her counsel (Nizer, My Life in Court, New York 1961, pp. 158–171). With this opinion of Billy's credibility, counsel would never have permitted Eleanor to rely on any representations by Billy. But if he had so permitted, certainly he would have insisted that the representations be set out in the agreement. And if he had so permitted and Eleanor had relied on representations not set out in the agreement, it is fantastic to suppose that the agreement would then contain an express disclaimer of any representations.

### E.

In view of the conclusion reached, it is unnecessary to discuss the many other points made by both sides. They have been carefully studied and do not affect the conclusion.

The motion of defendant executors is granted and the Clerk is directed to enter judgment in their favor.

So ordered.