In re **BEST FILM & VIDEO CORP.**, Debtor.

**D.C. FILMS, INC.**, Plaintiff,

v.

**BEST FILM & VIDEO CORP.**, Defendant.

Bankruptcy No. 184–40143–21.
Adv. No. 184–0084.

United States Bankruptcy Court, E.D. New York.

Feb. 21, 1985.

As Amended March 22, 1985.

Morton Berger, Spring Valley, N.Y., for Best Film & Video Corp.

John S. McBride, Michael Davidoff, Monticello, N.Y., for D.C. Films, Inc.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

This is an adversary proceeding brought by D.C. Films, Inc. ("D.C. Films") against Best Film & Video Corp. ("Best Film"), the debtor and debtor-in-possession, involving a contract for the distribution by Best Film of a film entitled "The Last Fight."

D.C. Films contends that this contract has been terminated and rescinded by it as a result of its breach by Best Film. D.C. Films wants "The Last Fight" returned to it, together with all related prints, copies and accessories, together with an assignment of all sub-distribution agreements and other contracts, plus other relief. To this end it seeks relief from the automatic stay imposed by 11 U.S.C. § 362.[1]

Best Film denies that its contract has been properly terminated or rescinded and

---

1. 11 U.S.C. § 362 provides, in part, that a petition filed under Title 11 operates as a stay of the following:

    (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title:

    \* \* \* \* \* \*

    (3) any act to obtain possession of property of the estate or of property from the estate.

asserts the right under 11 U.S.C. § 365(b)(1)[2] to cure any default should the Court find any default to be present. It also denies that D.C. Films is the real party in interest.

## JURISDICTION

At the time the complaint herein was filed on May 25, 1984, this Court had jurisdiction to hear it by virtue of 28 U.S.C. § 1471(a) and the "Emergency Resolution" entitled *In re Jurisdiction of Bankruptcy Courts,* and signed on December 21, 1982 by Chief Judge Jack B. Weinstein. That Resolution explicitly referred to the bankruptcy judges of this District "[a]ll cases under Title 11 and all civil proceedings arising under Title 11 or arising in or related to cases under Title 11." See *In re Kaiser,* 722 F.2d 1574 (2d Cir.1983).

■ The Court now has jurisdiction because this is a core proceeding which this Court is authorized to hear and determine when such a proceeding is referred to it by the District Court. 28 U.S.C. § 157(a), (b)(2)(G)[3], as added by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Public Law 98–353, 98th Cong.2d Sess. (1984). The blanket order of reference signed by Chief Judge Jack B. Weinstein on July 12, 1984, and amended August 7, 1984, embraces this adversary proceeding "to terminate, annul or modify the automatic stay."

**2.** § 365(b)(1), insofar as relevant, provides:

"If there has been a default in an executory contract ... of the debtor, the trustee may not assume such contract ... unless, at the time of assumption of such contract ..., the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract ..., for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract...."

**3.** "§ 157. Procedures

## THE FACTS

### A. "The Last Fight"

This proceeding has its genesis in a distribution agreement entered into by Best Film with respect to the film "The Last Fight." This film is the creation of Gerald Masucci, President of D.C. Films. He wrote the story, selected the musicians, hired the actors and director, and produced it. He was present every day during its production. He supervised the editing which took four months, working six to seven days a week, ten to twelve hours a day. The total cost of producing "The Last Fight" was $750,000.

"The Last Fight" has special appeal to Spanish-speaking people because it stars two Latin musicians and singers; its sound track was performed by the Fania All Stars, a group specializing in Latin music; it revolves around a Spanish boxer and its cast includes two Latin-American fighters, a former Mexican champion, and an ex-Puerto Rican heavyweight champion.

When the film was initially manufactured, prints were prepared with Spanish sub-titles for the purpose of exhibiting the film in San Juan, Puerto Rico and Caracas, Venzuela. D.C. Films still owns twenty such prints. In the United States there are between 200 and 300 theaters that play films with Spanish sub-titles or Spanish dubbed vocals.

### B. The March 7, 1983 Agreement

On March 7, 1983, Best Film entered into the agreement to distribute "The Last

"(a) Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

"(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

"(2) Core proceedings include, but are not limited to

\* \* \* \* \* \*

"(G) motions to terminate, annul or modify the automatic stay ..."

Fight" which is the subject of this proceeding. The agreement gives Best Film the sole and exclusive right in the United States to distribute and exhibit "The Last Fight" during the term of the agreement "in the English language (without foreign language sub-titles)." It gives Best Film no rights in the film with Spanish language sub-titles.

The agreement is between Best Film and "Inter-Ocean Film Sales, Ltd., 9255 Sunset Boulevard, Upper Penthouse, Los Angeles, California 90069 as agent for D. C. Films, Inc., a New York Corporation." In the agreement, Best Film is designated as the "Distributor" and "Inter-Ocean Film Sales, Ltd., as agent for D. C. Films, Inc." is designated as the "Licensor."

In brief, the contract specifies that the first theatrical play date is to be no later than June 15, 1983; that the film is not to be cut or edited without the written approval of the Licensor; that $75,000 is to be spent on films and advertising prior to the first play date; and that the schedule of advertising credits given to Best Film is to be observed. Further, Best Film is to pay an advance of $75,000 on April 30, 1983, to be recouped out of the gross proceeds of which Best Film was to receive certain specified percentages; monthly statements are to be sent by Best Film periodically to the Licensor; advertising and print expenditures are to be substantiated by paid invoices and bills, and books and records are to be maintained to which the Licensor is entitled to access.

In the event of a default by Best Film which is not cured within a specified period after notice, the contract may be terminated upon which event all rights revert to the Licensor. For a default in paying or accounting, the notice period is twelve days, for other defaults, it is thirty days.

Concurrently with the execution of the March 7, 1983 agreement, a one-page schedule of the credits referred to in Paragraph 7 of that agreement was turned over to Best Film. These credits require that the words "A Jerry Masucci Film" precede the title.

"The Last Fight" is the third film which Masucci has produced, all identified to the public as "A Jerry Masucci Film". By identifying the film in this way, Masucci hoped to build up his own reputation and also to increase ticket sales in the Latin community.

Despite the fact that the advertising materials prepared by Best Film conformed to the contract, the advertising of "The Last Fight" by subdistributor of Best Film has not always met the requirements of Paragraph 7 of Best Film's distribution agreement. In some cases all references to "A Jerry Masucci Film" has been eliminated, in other cases, the slogan did not precede the film's title, but followed it. *Ibid.*

### C. Delivery to Precision

On April 7, 1983, Jerry Masucci arranged for the original negative of "The Last Fight", the sound track and related materials termed the "pre-print" material, to be delivered to Precision Films Labs, Inc., ("Precision"), the laboratory selected by Best Film. Among the items delivered were the internegative and interpositive made from the original negative, the Spanish language sub-titles and the Spanish and English trailers. Before delivery could be made, D. C. Films had to satisfy a lien involving the twenty prints with Spanish language sub-titles.

Because D. C. Films had not yet received from Best Film the $75,000 payment due April 30, 1983, Precision was not immediately authorized to give Best Film access to these materials. Best film did not receive access until May 17, 1983, when an "access letter" addressed to Precision was signed by D. C. Films. Precision and D. C. Films signed this letter on May 17, 1983; Best Film on April 11, 1983. That letter advises Precision that D. C. Films has granted Best Film "the exclusive right to distribute, license and exhibit the English language motion picture 'The Last Fight' ". *Ibid.* An access letter does not authorize removal of the pre-print materials from the laboratory.

### D. The First Amendment; The Addendum

Sometime prior to the date on which Best Film was given access (probably on May 1, 1983), the parties modified in writing their distribution agreement in an "Addendum",

signed by Best Film and by "Jeff Franklin as agent for D. C. Films, Inc." The payment schedule was altered so as to provide for installment payments of the $75,000 due from Best Film with the last payment of $25,000 due on August 30, 1983; Best Film's minimum commitments for prints and advertising were increased from $75,000 to $110,000; and Best Film undertook to advance whatever money was needed for the making of a new internegative or interpositive to be recouped from the film's proceeds. *Ibid.* Furthermore, "[a]ny cost to be incurred for the issuing of an Errors & Ommissions [sic] policy" was to be shared equally by Best Film and "the Producer [sic]".

### E. The Pre-Print Materials Are Edited

By May 18, 1983, Barnett of Precision had determined that the interpositive was commercially acceptable but that a new internegative would have to be manufactured, and he so advised both D. C. Films and Best Film.

Preparation of a new internegative and of prints from such negative could have been completed by May 28, 1983, in ample time to meet the contracted for July 15, 1983 play date. In fact, however, the first print was not manufactured until the end of July and the balance in August, 1983.

During the intervening period Best Film cut and edited the interpositive from which it made a new edited internegative. The second track was altered to correspond.

No written authorization for such cutting and editing was ever secured from D. C. Films or Inter-Ocean. Possession of the pre-print materials was turned over to Best Films by Precision pursuant to a letter of authorization dated July 5, 1983, from D. C. Films' attorney, S. I. Nigrone.

Masucci testified unequivocally that he was unaware that the film had been edited until after it opened in New York in September, although he had been present on three previous occasions when the film was either exhibited, or was scheduled to be exhibited. His explanation as to why Best Film had been given possession of the pre-print materials which permitted the editing was that Best Film had claimed that the materials were needed to prepare a new English trailer. He no longer recalls what changes were made in the film.

### F. The Second Amendment

"The Last Fight" was not released on July 15, 1983 but had its first theatrical play date in mid-August.

Sometime later that month Masucci agreed to stretch out the $25,000 due August 30, 1983 so that only $15,000 would be paid that date and $5,000 on September 15, 1983 and $5,000 on September 30, 1983. This agreement was memorialized in a letter addressed to Jerry Masucci from Roy Winnick, President of Best Film.

### G. The Spanish Language Version

On June 21, 1983 Best Film entered into two written agreements with Marvin Films, Inc. of which Marvin Friedlander is the President. One agreement was a conventional sub-distribution agreement covered New York City, Albany and Buffalo, and committed Marvin Films to spend a minimum of $75,000 on advertising in New York City. Under the other agreement Marvin Films invested $12,500 in "The Last Fight" in return for 5% of Best Film's profits.

Sometime in the summer of 1983 Masucci told Winnick of the twenty prints which he had manufactured at his own expense with Spanish sub-titles for the Puerto Rican and South American market and inquired whether Winnick was interested in buying them. Winnick turned him down.

However, Friedlander told Winnick that he thought there was a good market for the picture with Spanish sub-titles. In that belief Friedlander contracted with the Corona Theater in Queens to show "The Last Fight" with Spanish sub-titles. To provide him with a print to carry out this contract, Winnick arranged to revise the optical track carrying the Spanish sub-titles to fit the version of "The Last Fight" as previously edited by Best Film. The cost of conforming the Spanish sub-titled band to the edited print was $335.

Masucci had no knowledge of these events. Winnick never discussed with Masucci the planned exhibition of a Spanish

sub-titled feature at the Corona Theater, nor did Friedlander. All that Friedlander discussed with Masucci was how the film was to be advertised.

On September 2, following the New York premiere on August 31, 1983, when Jerry Masucci learned of the plans to exhibit a Spanish sub-titled version at the Corona Theater, he promptly telephoned Barnett, Vice-President of Precision Laboratories, to instruct him not to release the Spanish language materials to Best Film. At his request, a letter was sent to Precision Film the same date, September 2, 1983 by Inter-Ocean to the same effect.

Barnett called Winnick to advise him of what was transpiring. Best Film decided, despite the objections of D.C. Films and Inter-Ocean, to proceed.

Under date of September 6, Richard B. Salzburg [4] wrote Jerry Masucci by certified mail claiming that both Marvin Films and Best Film had made a "commitment" to the Corona Theater that they were obliged to fulfill and therefore they were directing Precision to deliver the sub-titled print to the Corona Theater for showing beginning September 7. It played in that theater for a week and earned $2326.80.

After the exhibition of the Spanish sub-titled version of "The Last Fight" in the Corona Theater, the negotiations which Masucci had been conducting for the large scale distribution of that version came abruptly to an end. The persons with whom Masucci had been negotiating had wanted a guarantee that there had been no prior exhibition of the sub-titled version which Masucci was no longer able to give.

Masucci had been planning to enter into a distributorship agreement with respect to the Spanish language version as soon as the English language version had had its first run.

It is a fair inference from all the facts that the loss of interest in distribution of the Spanish sub-titled version of "The Last Fight" was due in whole, or in part, to the unauthorized action of Best Film and Marvin Films.

On September 16, 1983, D.C. Films and Inter-Ocean jointly sent Best Film a mailogram giving notice that the $5,000 payment on September 15, 1983 had not been received.

Under date of September 15, 1983, Best Film sent Inter-Ocean a check in the amount of $2,025.73 with a letter explaining that the $5,000 due that date was being reduced by the cost of producing a Spanish print, a Spanish trailer, and conforming the Spanish overlay to Best Film's edited version of "The Last Fight". Best Film also deducted 1/67th of New York's run advertising budget statement to be $93,500. The total amount by which the $5,000 due D.C. Films was reduced was $2,974.27.

The figure deducted for advertising was an allocation of the total advertising budget, not of the cost of advertising the Spanish language feature.

### H. The New York Litigation

On September 23, 1983 (eight days after the telegram demanding the $5,000 payment due September 15, 1983 had been sent) D.C. Films sued Best Film, Precision and Marvin Films in the New York Supreme Court in Sullivan County.

The complaint alleged that Best Film had failed to perform its obligations under its agreement with D.C. Films by: (a) exhibiting "The Last Fight" with foreign language sub-titles; (b) not releasing the film for exhibition until June 15, 1983; (c) cutting and editing the film without consent; (d) not including the proper credits in advertising "The Last Fight"; (e) permitting double billing without accounting properly therefore; and (f) failing to pay the $5,000 due September 15, 1983. Best Film's failure to meet its contractual obligations was alleged to have terminated its rights in "The Last Fight."

Precision was charged with unauthorizedly turning over the Spanish language version to Best Film; Marvin Films was charged with improperly showing "The

---

**4.** Up to January 9, 1984 Richard V. Salzburg held 50% of the shares of Best Film of which he was also an officer and director.

Last Fight" with foreign language sub-titles. All three, Best Film, Precision, and Marvin Films were accused of having unlawfully appropriated the property of D.C. Films.

By way of relief the Sullivan County complaint asked *inter alia,* one million dollars in damages from Best Film, Marvin, and Precision, the surrender of all materials relating to "The Last Fight", and a declaration that the March 7, 1983 Agreement is null and void. In addition, D.C. Films requested a temporary and permanent injunction against the exhibition of "The Last Fight" by the defendants.

Of the breaches of the March 7, 1983 Agreement, as amended, alleged in the complaint, the only one which D.C. Films had not proved in this Court, to have taken place prior to September 23, 1983, is that relating to double billing.

Although double billing of "The Last Fight" took place in New York on September 21, 1983, and in Chicago on October 17, 1983, neither was proven to have occurred during the picture's first run.

The only breach of which Best Film had been given written notice prior to the filing of the complaint was the failure to pay the $5,000 due September 15, 1983.

On October 4, 1983, Justice Joseph P. Torraca rendered a decision enjoining the distribution of "The Last Fight" with foreign language sub-titles, provided D.C. Films filed a bond in the amount of $100,-000. Justice Joseph P. Torraca thought a "serious question" to be present "as to whether or not a subsequent oral agreement gave the defendant the right to distribute that picture with foreign sub-titles." Justice Torraca gave no other injunctive relief, saying "Best Film may continue to distribute the said picture in the English language pursuant to the terms of the contract of March 7, 1983." *Id.* at p. 3. Since D.C. Films decided against incurring the expense of a bond no injunction ever issued. Further proceedings in the New York Court were stayed when Best Films filed for relief under Title 11 on January 25, 1984.

### I. Post Complaint Events

Following the filing of the Sullivan County complaint, Best Film on September 30, 1983 sent Inter-Ocean the check for $5,000 due that date and also a statement of the proceeds from the picture to that date accompanied by bills and invoices relating to the expenses incurred to that date by Best Film.

However, on October 26, 1983, Best Film wrote Inter-Ocean that for bookkeeping reasons it was stopping payment on the two checks sent earlier in the amount of $2025.73 and $5,000. And when Inter-Ocean on October 30, 1983, presented these checks for payment they were not honored.

In January 1984, the attorney for D.C. Films wrote Best Film requesting payment of Best Film's share of the cost of the "Errors & Omissions" Policy which was being threatened with cancellation for nonpayment. Winnick responded on February 8, 1984; its letter identifies the policy involved as "Pacific Indemnity Co. R.A. Boyer Co. Insurance Premium; Policy No. 7936–88–22," and threatens that if D.C. Films should "cause the above-mentioned E & O Policy to lapse, Best Film & Video Corporation will consider it as a material breach of the agreement." The letter asserts that nothing is due from Best Film "until and unless the receipt is received by said Best Film & Video Corporation for the full payment of $2,700 premium for the insurance policy above-captioned" and insists upon proof of payment. *Ibid.* To avoid cancellation of the policy, D.C. Films paid the balance due. No portion of the cost of that policy has ever been paid by Best Film.

### J. Best Film Files Under Chapter 11

On January 25, 1984, Best Film filed for relief under Chapter 11. During the pendency of this proceeding it has continued to exploit "The Last Fight" as though its contract with D.C. Films is fully in effect.[5]

---

5. At the pretrial hearing in his case on July 11, 1984, D.C. Films' attorney asked for a trial as soon as possible, saying:

"It has come to light just recently that what they are doing with this film is selling off the rights of this film. Anytime you sell off any-

On May 31, 1984, it entered into a three-film deal with *Astro Pathe* to distribute the film in Canada. On June 14, 1984, it entered into an agreement with Thorn/ENI.[6]

But while Best Film continued to exercise rights under the March 7, 1983 agreement, following the filing under Chapter 11, no accounting statement was sent D.C. Films until August 24, 1983. Indeed, Best Film has never sent D.C. Films monthly accounting statements and has sent three, at most, since the date the film was released.

On April 18, 1984, D.C. Films first sought relief by motion from the restrictions imposed on it by 11 U.S.C. § 362. When Best Film opposed the application on the grounds that an adversary proceeding was required, the complaint herein followed.

This complaint describes the litigation in Sullivan County, lists the breaches alleged there as entitling D.C. Films to rescind the March 7, 1983 contract,[7] claims the contract to have been terminated pursuant to its terms prior to the Chapter 11 petition, asserts that "The Last Fight" never became part of the estate of the debtor, requests a declaration that the contract with Best Film is rescinded, and that D.C. Films is entitled to immediate possession of "The Last Fight". No monetary damages are alleged or requested although an accounting is sought. It was the position of the attorney for D.C. Films that damages, and even the right to an accounting should be left to be determined in the still pending, and stayed, Supreme Court proceeding,[8] what D.C. Films wants from this proceeding is the return to it of control of "The Last Fight."

### The Affirmative Defense of the Wrong Party Plaintiff

When the case was called for trial, Best Film moved to amend its answer to plead the wrong party plaintiff and simultaneously moved to dismiss the complaint on that ground. Best Film claimed the real party in interest was Inter-Ocean. The Court permitted the amendment but denied the motion to dismiss.

All that the record discloses with respect to Inter-Ocean is that under date of August

more rights, I think we are going to be very prejudiced.

I assume it is going to be approved by the Court and if we delay it any further, it is just going to continue to sell off the rights and we are going to be ending up with nothing in the event we are successful in our application to get the film back."

The Court then turned to the attorney for Best Film, Mr. Berger, saying that it was not aware of any sales of which the Court has approved to which Mr. Berger said flatly:

"There has been *no sales of rights, Judge,* at all."

*Id.* at 4.

When Mr. Berger was subsequently asked to reconcile these agreements with his earlier statement to the Court, he replied that he did not consider such agreements to constitute a "sale" of "rights."

**6.** The beneficiary of whatever proceeds Best Film is able to derive from "The Last Fight" is Precision. On February 27, 1984, Precision sought relief from the stay imposed by 11 U.S.C. § 362 in order to foreclose on its mechanic's liens on the films in its possession, including "The Last Fight". According to Precision, Best Film owed it $93,391.84, of which $90,642.86 was owed on work done on "The Last Fight".

No notice of this application was sent D.C. Films nor did the moving papers make any reference to the dispute concerning Best Film's right to these materials. Under the terms of the settlement between Best Film and Precision, consented to by the attorney for the Creditors Committee, Precision was authorized to release all the films subject to its lien in return for 50% of the films' gross income until its lien was repaid in full. Had the Court been aware of the dispute between Best Film and D.C. Films regarding "The Last Fight", it would not have approved the settlement and it is now vacating such approval.

**7.** At the conclusion of the trial, D.C. Films was permitted to amend its complaint in this Court and add as a breach the failure to pay the $5,000 due September 30, 1983.

**8.** When the Court said at the conclusion of the trial that it had not understood that D.C. Films was bifurcating damages from liability, it temporarily forgot that the complaint sought only relief from stay and that damages were not in issue and could not be until either claims were filed by D.C. Films and objected to by Best Film or leave was given to continue D.C. Films' pending damage suit in the New York Supreme Court.

25, 1982, Jerry Masucci Productions, not otherwise identified, on whose behalf Jerry Masucci signed as President, entered into an agreement with Inter-Ocean for whom Anne Kopelson signed as President. In this letter agreement relating to "The Last Fight" it is provided, in part, as follows:

"The owner and producer of the captioned film (hereinafter called 'Producer'), herewith irrevocably designates Inter-Ocean Film Sales, Ltd. (hereinafter called 'IOF') as the exclusive world sales organization of the captioned film (hereinafter called 'Film') in all gauges and in all media ... in ·all territories of the world ... during the period of five (5) years from the date of delivery of the Film (the 'Term').

IOF agrees to act in said capacity to promote the licensing of the Film in the territories and to prepare all contracts with distributors

\*       \*       \*       \*       \*       \*

In consideration of the agreements herein contained ... [i]n the United States, its territories and possessions, IOF shall retain as its fee ten percent (10%) of all sums received by it from distributors, licensees and/or purchasers resulting from payments of guarantees, for flat licenses or from the exploitation and/or distribution of the film in the aforesaid territories.

\*       \*       \*       \*       \*       \*

This Agreement shall be governed by the laws of the State of California.

\*       \*       \*       \*       \*       \*

Nothing herein contained shall constitute a partnership between or joint venture by, the parties hereto or constitute either party the agent of the other." (DX AA).

During the course of the trial, this Court received a verified statement over the signature of Anne Kopelson, identified as chairwoman of Inter-Ocean, that Inter-Ocean consents to be bound by any decision made in this Court and that Inter-Ocean expressly waives its rights, if any, against Best Film.

If the debtor, Best Film, is not permitted to continue distributing "The Last Fight", it will be unable to recoup the money which it has advanced under its contract. Best Film has invested in the marketing, distribution, manufacture of prints, and advertising, in excess of $200,000. Its print order alone cost almost $90,000. *Ibid.* About $250,000 was originally laid out, of which $50,000 has been recouped, leaving about $200,000 still outstanding.

Winnick testified that he was ready, willing and able to cure any defaults found by this Court in the contract "between Best Film and Interocean [sic] Film".

To prepare a new internegative and a new interpositive from the original negative so as to eliminate the editing performed by Best Film will cost around $10,-000. To restore the original sound track will take $15,000. Additional money will be needed to recreate the original Spanish sub-titles.

In D.C. Films' memorandum filed at the conclusion of the trial, D.C. Films asks (a) possession of all materials pertaining to "The Last Fight"; (b) an assignment of all license agreements relating to the film; (c) an accounting for all proceeds and (d) the rights to file claims against Best Film for $10,000 (unpaid periodic payments) $1,350 (unpaid insurance premium) and $25,000 (the cost of restoring the film to its pre-edited version).

## DISCUSSION

### I

■ The first issue to be decided is whether Best Film's contract with D.C. Films is still in existence or whether it was terminated or rescinded either prior to the time Best Film filed for relief under Chapter 11 or since that time. An executory contract can only be assumed if it has not earlier been terminated.

■ Filing a Chapter 11 petition will not resuscitate a contract that has already been terminated.

The authorities are collected in *In re Anne Cara Oil Company, Inc.,* 32 B.R. 643 (B.C.D.Mass.1983) where the court held that a notice of termination of a franchise agreement sent prior to the filing of a petition under Chapter 11 became effective subsequent thereto despite the automatic stay. The court noted first the cases dealing with pre-petition termination:

> "If the franchise relationship had been terminated prior to the filing of the Chapter 11 petition, § 362 would offer no protection to the debtor as it is well settled that the bankruptcy court cannot create an interest for the debtor where none exists. *See; e.g., In re LJP, Inc.,* 22 B.R. 556, 558, 9 B.C.D. 853, 854 (Bkrtcy. S.D.Fla.1982) ('no legislative intention to permit assumption or reinstatement of contracts which have expired or have been terminated before bankruptcy'); *In re Volpe Enterprises, Inc.,* 23 B.R. 818, 820 (Bkrtcy.S.D.Fla.1982) ('nothing left for the court to resuscitate or protect'); and *In re Butchman,* 4 B.R. 379, 381, 6 B.C.D. 403, 404 (Bkrtcy.S.D.N.Y.1980) ('[b]ankruptcy [c]ourt cannot ... cultivate rights where none can grow'). 'The Bankruptcy Code generally does not grant the debtor ... greater rights and powers under a contract than the debtor ... had outside of bankruptcy'. *In re Douglas,* 18 B.R. 813, 815, 8 B.C.D. 1233, 1234 (Bkrtcy.W.D.Tenn.1982)." 32 B.R. at 647.

It then went on to point out that bankruptcy does not extend a contract.

> " 'Generally, a bankruptcy court may not extend a contract beyond its original terms. The Bankruptcy Code neither enlarges the rights of a debtor under a contract, nor prevents the termination of a contract by its own terms.' [citations omitted]. *In re Advent Corp.,* 24 B.R. 612, 614, 9 B.C.D. 1103, 1104 (Bkrtcy. 1st Cir.1982). 'The general rule is ... if the [non-debtor] party had a right to terminate the arrangement, that right survives adoption of the contract by the trustee....' *Thompson v. Texas Mexican Railway Co.,* 328 U.S. 134, 141, 66 S.Ct. 937, 942, 90 L.Ed. 1132 (1946).

'[T]he right to terminate a contract pursuant to its terms survives the bankruptcy of the other contracting party.' *Id.* at 142, 66 S.Ct. at 943. *See also In re Schokbeton Industries, Inc.,* 466 F.2d 171 (5th Cir.1972).

\*　　\*　　\*　　\*　　\*　　\*

'The [Bankruptcy] Code does not ... grant the debtor ... greater rights and powers under the contract than he had outside of bankruptcy. [There is] nothing in the Code which enlarges the rights of [the debtor] under the contract or which prevents the termination of the contract on its own terms....' *In re Nashville White Trucks, Inc., supra* [5 B.R. 112] at 117 [ (Bankr.M.D.Tenn. 1980) ].' " *Ibid.*

See also *Good Hope Refineries, Inc. v. Benavides,* 602 F.2d 998 (1st Cir.) *cert. denied,* 444 U.S. 992, 100 S.Ct. 523, 62 L.Ed.2d 421 (1979); *Schokbeton Industries, Inc. v. Schokbeton Products Corp.,* 466 F.2d 171 (5th Cir.1972); *In re Chuck Wagon Bar-B-Que, Inc.,* 7 B.R. 92 (Bankr. D.C.1980). *In re Benrus Watch Co.,* 13 B.R. 331 (Bkrtcy.S.D.N.Y.1981); *In re Beck,* 5 B.R. 169 (Bkrtcy.S.D.N.Y.1980).

## II

■ It is the position of D.C. Films that its contract with Best Film came to an end long prior to the filing of the petition herein, that on September 23, 1983, as a result of the various breaches of that agreement by Best Film, D.C. Films "elected to rescind the contract" and "chose to terminate the agreement pursuant to paragraph 14 of the licensing agreement." Complaint para. 8, 11. That is the date on which D.C. Films brought the Sullivan County action, stayed by this bankruptcy proceeding, seeking a judicial declaration that its contract with Best Film was at an end.

The evidence establishes beyond peradventure all the breaches pleaded on September 23, 1983 with the exception of the alleged breach of the contractual provision relating to double billing. Since then, Best Film has further wronged D.C. Films by

treating the benefits of the contract as available to it but rejecting its burdens. Best Film has not made the $5,000 payment due September 30, 1983; it has not submitted the regular accounting statement called for by the contract; and it has refused to pay its share of the insurance policy.

Best Film does not deny that it has breached its agreement in many respects. Its defense is, first, that Masucci waived most, or all these breaches and that, in any event, under paragraph 14 of their contract there cannot be a termination without a twelve, or thirty-day notice, depending upon the nature of the breach, and such notice has not been given.

Best Film claims that it failed to meet the called for opening play date because the materials delivered were defective; that Masucci thereafter waived this breach; that D.C. Films knew of the cutting and editing of "The Last Fight" while it was in progress and did not protest; and that Masucci knew in advance of the arrangement to exhibit a Spanish sub-titled version at the Corona Theater and did nothing to stop it until after a commitment had been made when it was too late. The evidence does not bear Best Film out. And, even if it did, these events would not rise to the dignity of a waiver of Best Film's gross breaches of unambiguous language.

The delay in opening was not due to the defective internegative. The record shows that there was ample time to manufacture a new ‘negative before the agreed-upon play date, if nothing more had been done. What evidently required time was the unauthorized editing and cutting. The play date was not met because Best Film was engaged in doing what it had obligated itself not to do, and that is to revise Jerry Masucci's work without his written authorization.

There is no evidence that Masucci knew of the unauthorized cutting and editing. All that is in the record is testimony by Barnett that Sandy Bennett, a minor D.C. Films' employee, and Negrone, D.C. Films' attorney, were aware of what was going on. Barnett is an interested witness and the Court doubts that he had the conversation he claims, but Barnett is not a party to Best Film's agreement with D.C. Films and whatever conversations he had, they cannot change the terms of that agreement. The contract is unambiguous that the film cannot be cut, or edited, without written authorization.

The evidence is even weaker respecting Masucci's claimed knowledge of Marvin Film's intention to license the exhibition of the Spanish sub-titled version. Marvin Friedlander during his direct examination tried to support that claim, asserting that he had spoken to Masucci with regard to playing "The Last Fight" with Spanish sub-titles at the Corona Theater and Masucci had responded "good". However, when Friedlander was subsequently pressed on cross-examination as to exactly what conversations he had had with Masucci, it developed that they had been limited to discussions of advertising.[9] Since Friedlander was the source of Winnick's belief in Masucci's knowledge, that belief is clearly without foundation. If Masucci did not object sooner than he did to the unauthorized and tortious exhibition of "The Last Fight" with Spanish sub-titles, it was not

**9.** The following colloquy during cross-examination flatly contradicts Friedlander's earlier statements:

Q. What is your best recollection as to what you said to Masucci and what he said to you, about the film, "The Last Fight"?
A. I asked him about how he felt about where he wanted the picture advertised.
Q. Where he wanted it advertised?
A. Yes.
Q. What did he say?
A. We talked about the Spanish newspapers and maybe some Spanish television.

Q. And that was to advertise the movie?
A. Yes.
Q. Was there any talk, at that time, whether that advertisement was going to be for the English version or for something else?
A. No.
The examination continued:
Q. Any further conversations thereafter, with Mr. Masucci, about Spanish in the picture?
A. No.

because he was waiving the restrictions in the contract but because he was unaware of the violation.

Certainly, D.C. Film never waived its right to the payments due September 15, 1983, and September 30, 1983. The only breach D.C. Films waived was the failure to open on July 15, 1983. It waived that breach when it amended its distribution agreement with Best Film with full knowledge that the play date had come and gone and the film had not been opened for exhibition.

With respect to all the other breaches pleaded in the Sullivan County action and proved in this Court, there has been no waiver.

## III

All the witnesses who testified in this proceeding are interested witnesses. That is as true of Friedlander and Barnett as of Masucci and Winnick, but whereas Masucci's answers were straightforward, those of the others were evasive. Winnick and Friedlander both failed to tell the full truth respecting their dealings with each other.

Friedlander and Barnett are interested witnesses because their companies are defendants in the million dollar damage suit still pending in Sullivan County based on the unauthorized exhibition of the Spanish sub-titled version of "The Last Fight". Furthermore, the ability of both Marvin Friedlander and Precision Film to recover the investment each has made in "The Last Fight" depends upon Best Film being entitled to retain control of that property.

The lack of candor of both Winnick and Friedlander emerged most strongly when they were asked about the contracts between them. In fact, there were two such contracts both entered into the same day and both in writing, one a conventional sub-distribution contract, the other, giving Marvin Films a 5% interest in Best Film's profits on "The Last Fight" in exchange for $12,500. Yet, when Winnick was pressed as to what agreements he had with Marvin Films, he repeatedly denied the existence of any written agreement whatso-

ever and acknowledged only an oral sub-distribution agreement.

Friedlander testified to the existence of only a single written agreement with Best Film. In addition, he denied knowing the limitations on Best Film's authority with respect to "The Last Fight".

This Court does not believe that either of them could have forgotten an agreement giving Marvin Films a 5% interest in Best Film's profits nor does it think it likely that an experienced businessman, like Friedlander, would invest $12,500 without finding exactly what he was buying. Their willingness to be less than forthcoming on matters subject to check has led the Court to resolve any conflict between their testimony and that of Masucci in the latter's favor.

Furthermore, the strenuous efforts Masucci made on September 2, 1983, to stop the exhibition at the Corona Theater are wholly consistent with his claim that until then he had no knowledge what Best Film and Friedlander were contemplating and are wholly at odds with Friedlander's claim that Masucci had complacently answered "Good", when told that, without paying D.C. Films a cent, Marvin Films proposed to exhibit, not only the English version which they were licensed to distribute, but the Spanish sub-titled version as well.

## IV.

D.C. Films has met the requirements of paragraph 14 of the March 7, 1983 agreement with respect to termination. Paragraph 14 provides that in certain events "in addition, and without prejudice to any other right or remedy which Licensor may have on account thereof, all licenses, rights and privileges of the Distributor under this Agreement, shall, at the option of Licensor, terminate and cease ..."

One such event is the failure to pay any sum which Best Film has agreed to pay where "such default [is] not cured within twelve days after written notice thereof is sent distributor by certified or registered mail, telegraphed or hand delivered." Another event giving rise to a right of termi-

nation is "any other material default" which is not cured "within thirty days after written notice."

On September 16, 1983, written notice was sent to Best Film that the payment due September 15, 1983 had not been received. That default was not cured when Best Film mailed approximately half that amount, explaining the absence of the balance as due to Best Film's unilateral decision to set off its alleged expenses in connection with the unauthorized Spanish language version.

■ There is no merit to Best Film's argument that D.C. Films, by declaring the contract terminated on September 23, 1983, less than twelve days after notice of the default in the $5,000 payment, placed itself outside paragraph 14. All that D.C. Films did was to anticipate the termination which would take place five days later on September 28, 1983. New York follows the rule that a notice of termination allowing a period of time shorter than that stipulated in a contract becomes effective after the lapse of the fixed time. *Bitterman v. Gluck,* 256 A.D. 336, 9 N.Y.S.2d 1007 (1st Dept. 1939); *Gallo v. Mayor, etc. of New York,* 15 A.D. 61, 44 N.Y.S. 143 (2d Dept.1897).

## V

In view of Best Film's multiple breaches of the licensing agreement, compliance with paragraph 14 was not a condition precedent to termination or rescission by D.C. Films.

■ New York permits rescission where a breach is "material and wilful, or, if not wilful, strongly tend to defeat the object of the parties in making the contract." *Callanan v. Powers,* 199 N.Y. 268, 284, 92 N.E. 747 (1910). See also *In re Waterson, Berlin & Snyder Co.,* 48 F.2d 704 (2d Cir.1931), A.N. Hand, Jr.; *United States Plywood Corp. v. Hudson Lumber Co.,* 113 F.Supp. 529 (S.D.N.Y.1953); *Rosenwas-*

*ser v. Blyn Shoes, Inc.,* 246 N.Y. 340, 159 N.E. 84 (1927); *O'Herron v. Southern Tier Stores, Inc.,* 9 A.D.2d 568, 189 N.Y.S.2d 323 (3d Dept.1959); *Driver-Harris Co.,* 12 F.Supp. 918 (W.D.N.Y.1935); *Oscar Barnett Foundry Co. v. Crowe,* 219 F. 450 (3d Cir.1915); *Ruby v. Ebsary Gypsum Co.,* 36 F.2d 244 (W.D.N.Y.1929); *De Mille Co. v. Casey,* 115 Misc. 646, 189 N.Y.S. 275 (Sup. Ct.1921). In the words of Judge Augustus N. Hand: "To allow rescission default must be such that it 'destroys the essential objects of the contract' or it 'must be so fundamental and pervasive as to result in substantial frustration'". *In re Waterson, Berlin & Snyder, supra,* 48 F.2d at 709.

These standards were met here. The breaches by Best Film should not be viewed in isolation. What is significant is their totality. Best Film treated the agreement it signed with D.C. Films as a meaningless piece of paper, in no way inhibiting it from doing whatever it elected with the film created by Masucci and the materials belonging to D.C. Films. Best Film's conduct in its entirety is incompatible with the obligation to deal in good faith which inheres in every contract.

Of the various breaches in the March 7, 1983 agreement the most serious was the unauthorized screening of the sub-titled version of "The Last Fight". This screening involved a series of wrongs, each compounding the other. In order to exhibit a sub-titled version, it was necessary for Best Film to obtain access to film material to which it had no right, that is the Spanish optical track, to edit and alter this track which was not its property and then without authorization, and with the knowledge that Masucci was trying to sell distribution rights to that version to third persons, rights which Best Film had turned down, show the picture at the Corona Theater.

Masucci testified that this single exhibition killed off any hope of selling the Spanish version for distribution to anyone else.[10]

---

**10.** At the conclusion of the trial the Court took a less serious view of the wrong done D.C. Films by the Corona episode. On further reflection, however, the Court has concluded that it did not

properly evaluate the evidence. As the Court itself pointed out at the time:

"This is no case to be decided off the cuff or off bench. I don't want either of you gentle-

But this breach did not stand alone. It was simply one of several, including the unauthorized cutting and editing of the film, and the failure to make the agreed-upon payments. The destruction of D.C. Films' potential market for a Spanish sub-titled version, plus the failure to pay it what was due, amply justified termination.

### VI

In the view of this Court the notice requirements laid down in paragraph 14 were met by the telegram of September 17, and the subsequent complaint in Sullivan County. But even were the facts otherwise, D.C. Films would have been entitled to declare the contract at an end under general principles of contract law. Instructive in this connection is *Olin Corp. v. Central Indus., Inc.*, 576 F.2d 642 (5th Cir.1978). In that case a fertilizer manufacturer brought suit against a warehouseman seeking a declaration that the warehouseman had breached its warehousing agreement with the manufacturer and asking that the agreement be declared terminated. The plaintiff had discovered that the warehouseman was stealing fertilizer by short-weighing stacks and keeping the excess. The defendant was successful in securing a direct verdict in the district court because of the failure of the manufacturer to comply with a ninety-day notice-of-default clause not too dissimilar from that in the contract here involved.

The Court of Appeals reversed, following what it termed the Williston view that unless a contract provision for termination for breach upon notice is in terms exclusive it is a cumulative remedy and does not bar the ordinary remedy of termination for a breach which is material or which goes to the root of the matter or essence of the contract. 576 F.2d at 647. The Court of Appeals rejected what it read as the Corbin rule, "that where such a termination provision is included in the contract, it consti-

tutes the exclusive means of terminating the contract." *Ibid.*

The current editor of Corbin on Contracts agrees with the result reached by the Fifth Circuit, but disagrees that Corbin's treatise would have necessitated a different result. The editor's commentary notes that performance of such a contractual obligation as a notice requirement can be excused just as any other contractual promise. The commentary continues in words pertinent to the present proceeding:

"By framing the issue as one of 'excuse', the court insures that justice can be done even in a case where the contract provides that a specified period of notice is 'exclusive', and justice demands that a party be entitled to terminate without such notice nevertheless.

It seems to the present author that Olin presents just such a case where Olin could have terminated as it did even despite contract provisions that the 90 days notice be *exclusive*. The notice provision assumed that the breaches which would be used to terminate the contract would be *curable* breaches. There was a *frustration of purpose* when a breach involving fundamental dishonesty by one party occurred, because no amount of payment for past thefts by Central could ever restore the business trust and confidence which Olin wanted to have in its distributors. The 'continuing sense of reliance and security' which is always 'an important feature of the bargain', Comment 1 of Unif. Commercial Code § 2-609, had been completely destroyed, and could not possibly have been reinstated. Under the circumstances, then, Central's breach was a *vital* breach, it would have been sufficient to allow Olin to rescind the contract even if the contract had been in terms an absolute one for a fixed term with no *right of termination at all;* it seems strange to suggest that the right of immediate termination is lost because the parties expressly provided a means

men to think, from any of my remarks, that I have reached a decision as to any aspect of this case. On a number of points, the evidence is in conflict and I will have to examine

the transcript and compare it with the contract. I also haven't had a chance to study all the exhibits."

of terminating for lesser, curable breaches.

Obviously, not every vital breach will excuse the obligation to follow the contract procedures for termination. And the present author is not yet prepared to suggest what circumstances will distinguish the two cases. Courts, using their good sense, will be able to tell breaches which excuse the obligation to give notice from breaches which do not. It is perhaps enough that they are aware that a distinction must be drawn here." Corbin on Contracts, 1982 Supplement by Colin K. Kaufman, Part 2, § 1266, at pp 369–370

Similarly here, the notice provision assumes that the breach which could result in termination would be a curable breach. The unauthorized exhibition of the Spanish language version in a single theater was not a curable breach. Nothing that Best Film could do could recall that act or change its consequences. It was a vital breach. Consequently, it gave D.C. Films the right to rescind the contract, even if there had been no right of termination at all under the contract. That there was such a right imposed no limitation on rescission under general contract principles.

## VII

The other arguments made by Best Film as to why the contract did not come to an end long prior to the filing of its petition have little merit. Best Film contends that the D.C. Films waived termination; it also claims that the monetary loss it would suffer if it loses its rights to "The Last Fight" bar D.C. Films from such relief.

■■■ The few acts taken by D.C. Films subsequent to its efforts to terminate or rescind its contract with Best Films are too inconsequential to qualify as a waiver. Slight and trivial acts of affirmance will not destroy a rescission once unequivocally made. *Albert v. Martin Custom Made Tires Corp.*, 116 F.2d 962, 965 (2d Cir. 1941); *Adams Mitchell Co. v. Cambridge Distributing Co.*, 189 F.2d 913, 917 (2d Cir.1951); *Weigel v. Cook*, 237 N.Y. 136,

140, 142 N.E. 444, 446 (1923); *Gravenhorst v. Zimmerman*, 236 N.Y. 22, 38, 139 N.E. 766 (1923).

■■■ In the category of slight and trivial acts the Court would include (a) Inter-Ocean's abortive efforts to cash the last two checks sent it by Best Film after Best Film had stopped payment; and (b) the request for payment of Best Film's share of the cost of the "Errors & Omissions" Policy. Acceptance of money due under a contract at the time of termination does not waive a right of termination exercised in accordance with the terms of the contract. *Weber v. Mapes*, 98 A.D. 165, 90 N.Y.S. 225, 228 (1904).

With regard to the demand for payment as part of the cost of the insurance policy, as long as Best Film insisted on its right to retain possession of, and exploit, "The Last Fight", it was not unreasonable, even on a *quantum meruit* basis, to seek reimbursement of a portion of the cost of the insurance—which, incidentally, was never received. D.C. Films' consistent position has been that its contract with Best Film is at an end.

There is a short answer to Best Film's contention that to force it to give up its rights to "The Last Fight" will prevent it from ever recovering its investment in the property and that equity abhors a forfeiture. This answer is that insofar as termination is predicated on failure to pay or any other contractual default, the Court will be doing no more than giving effect to the terms of the contract the parties themselves wrote. Paragraph 14 of the March 7, 1983 agreement clearly entitles D.C. Films to the relief it seeks here where a default in payment has remained uncured after proper notice.

■■■ Bankruptcy Judge Galgay pointed out with respect to a very similar contractual provision in which there had been a failure to render a similar accounting: "Under ordinary principles of contract law, it is well established that persons who agree as a result of arm's length bargaining are held to the terms of their agree-

ments." *In re Creed Taylor, Inc.*, 10 B.R. 265, 267 (B.C.S.D.N.Y.1981). It is true that Bankruptcy Judge Galgay was applying California law, but New York law is no different. If the parties to a contract adopt a provision which contravenes no principal of public policy and contains no element of ambiguity, the courts have no right, by the process of interpretation, to relieve one of them from disadvantageous terms to which he has agreed. 22 N.Y. Jur.2d, Contracts, § 190 (1982).

■ Apart from paragraph 14, and looking to the principles of law governing rescission, the rule that equity will not enforce a forfeiture is not absolute or inflexible. There is no insuperable objection to the enforcement of a forfeiture when to do so is more consistent with principles of rights, justice and morality than to withhold equitable relief. 2 Pomeroy, Equity Law, § 460(a) at p. 320 (5th Ed.1941).

■ Where rescission is predicated on breach of contract "the status quo requirement as to the defaulting party relaxes as the breach, itself, becomes more serious." *Lipsky v. Commonwealth United Corporation*, 551 F.2d 887, 898 (2d Cir.1976).

### VIII

■ The defense that D.C. Films is not the real party in interest and hence is not the proper party plaintiff comes close to being frivolous. D.C. Films is identified in the March 7, 1983 contract as the principal to the contract with Best Film; Inter-Ocean is clearly identified as acting solely as agent for D.C. Films.

D.C. Films as the disclosed principal to the contract made by its agent, Inter-Ocean, is the proper party to enforce the contract. To quote the Restatement on Agency, 2d, "The other party to a contract made by an agent or a disclosed ... principal ... is liable to the principal as if he had contracted directly with the principal, unless the principal is excluded as a party by the form of terms of the contract." 2 Restatement, Agency 2d, § 292 (1957).

■ Indeed, an agent cannot maintain an action on a contract in his own name on behalf of his principal unless he is a party to the contract, a transferee, or a holder of an interest in the contract. *Colonial Sec. Inc. v. Merrill, Lynch, Pierce*, 461 F.Supp. 1159, 1165 (S.D.N.Y.1978). In those special circumstances, New York law allows an action on a contract made in the name of an agent to be brought either by the principal or the agent. *Hercules Inc. v. Dynamic Export Corp.*, 71 F.R.D. 101, 105 (S.D.N.Y. 1976); *Weniger v. Union Center Plaza Associates*, 387 F.Supp. 849, 855 (S.D.N.Y. 1974); *Shirai v. Blum*, 239 N.Y. 172, 182, 146 N.E. 194 (1924); *Ludwig v. Gillespie*, 105 N.Y. 653, 11 N.E. 835 (1887); *Considerant v. Brisbane*, 22 N.Y. 389 (1860); *Helman v. Dixon*, 71 Misc.2d 1057, 338 N.Y.S.2d 139, 142–143 (Sup.Ct. Queens Co. 1972). See N.Y. CPLR § 1004 (McKinney 1963). Thus, at best Inter-Ocean might also have a right to sue but it cannot displace D.C. Films as the real party in interest. Cf. *O'Sullivan v. Jarach-Guetta Industrial Overseas Company*, 194 Misc. 534, 87 N.Y.S.2d 118 (N.Y.Supp.1949).

### IX

Since the Court has concluded that the agreement between D.C. Films and Best Film has long since come to an end there is no occasion for reaching the issue as to the defaults which Best Film must cure in order to assume that contract.

Since this case may be appealed, however, it may be desirable to indicate what this Court believes assumption would require.

With respect to the late play date since this breach was waived by D.C. Films when it executed the agreement of August 25, 1983, nothing need be done by Best Film. With respect to the editing of the film which was done without the written authorization of D.C. Films, Best Films should be allowed to continue exhibiting the film in its edited version if it is able to satisfy the Court that the editing was of the character for which it could have obtained authorization under the clause of the contract pre-

cluding D.C. Films from unreasonably withholding authorization, should Best Film wish to edit the picture. Otherwise, Best Film will have to remake prints which conform with the original.

Furthermore, since no written authorization was ever obtained to cut up the film materials and since Jerry Masucci is entitled to have the film which he created exhibited as he intended it to be, Best Film will either have to itself restore, or pay for the restoration of, an interpositive which duplicates the original negative, the original sound track and the Spanish language sub-titles. There is no reason why these costs should be borne by D.C. Films.

In addition, Best Film would have to take steps to ensure advertising of the picture in accordance with the credits by amending its agreements with the various sub-distributors to require that their advertising conform with the credits and provide Masucci with copies of such contracts.

Further, Best Film would have to provide exact accounts backed up by detailed bills and invoices with respect to all the proceeds it has received from the distribution of "The Last Fight" and the advertising it has done; and be prepared to pay over to D.C. Films whatever such accounting shows to be due it.

Finally, D.C. Films is entitled to be recompensed for the profit it lost through the unauthorized display of the Spanish sub-titled version and also for half the cost of the "Errors and Omissions Policy".

## CONCLUSIONS OF LAW

Best Film breached its distribution agreement with D.C. Films in a number of respects. Some of the major breaches were:

Best Film failed to make the periodic payments required by contract;

Best Film edited the film without prior written consent of the plaintiff;

Best Film allowed the distribution of the film with foreign language subtitles;

Best Film allowed its subdistributor to advertise the film without the proper credits;

Best Film failed to reimburse the plaintiff for half the premium paid on a policy of Errors and Omission Insurance;

Best Film failed to open the film on June 15, 1983, as required by the contract.

Because of certain of these breaches the contract was terminated by D.C. Films as authorized by paragraph 14, no later than September 28, 1983.

Because of certain of these breaches which were vital and material, D.C. Films elected to rescind the contract and manifested such election on September 23, 1983, by seeking a judicial declaration that the contract was at an end.

By filing a complaint seeking a declaration that the contract was at an end, D.C. Films gave notice of the provision of the contract that it deemed to have been breached. These breaches have not been cured.

When Best Film filed for relief under Title 11, it had no executory contract with D.C. Films because the contract had been terminated and rescinded and had come to an end.

## RELIEF

D.C. Films is entitled to relief from stay to the extent necessary to permit it to exercise the rights given it under its contract with Best Film upon termination of the contract. This means that all licenses, rights and privileges which Best Film has under its agreement with D.C. Films have terminated and ceased; that D.C. Films is entitled to immediate possession of all property relating to "The Last Fight", including all positive prints thereof, the remanufactured internegative and sound track and all books, records and contracts of Best Film relating to the distribution and exhibition of "The Last Fight". Furthermore, D.C. Films has the right to collect all monies due under any contract made by Best Film and Best Film must assign to D.C. Films all contracts relating to "The Last Fight" and all monies due, or to become due, under such contracts.

The relief from stay accorded D.C. Films does not embrace any monetary claims which D.C. Films has against Best Film which must be asserted by filing claims against Best Film. Monetary claims include any claims for monies collected by Best Film since the termination of the distribution agreement.

It is not appropriate at the present time to lift the stay so as to permit resumption of the litigation in New York courts against Best Film, unless D.C. Films is willing to waive any monetary claims against Best Film. In terms of bankruptcy law, however, there is no reason why the cause of action against Best Film should not be severed from the claims against Precision and Marvin Films to permit that litigation to continue against those parties.

D.C. Films is also entitled to an accounting from Best Film with respect to all proceeds from "The Last Fight" but only for the purpose of filing an appropriate claim.

SUBMIT JUDGMENT.

APPENDIX

EXCERPTS FROM PX 1

"1. GRANT OF RIGHTS. The Licensor hereby grants to the Distributor and its licensees, the sole and exclusive right, license and privilege, under copyright and otherwise, to distribute and exhibit the Picture during the Term throughout the Territory in the English language (without foreign language sub-titles) by any means, whether now known or hereafter devised, solely for theatrical, non-theatrical and home video cassette exhibition. All rights not expressly granted hereunder are reserved by Licensor.

*     *     *

The first theatrical playdate will be no later than June 15, 1983.

2. The rights herein granted to Distributor shall include the following for the Territory and the aforementioned term:

(a) The right to cut and edit the Picture, as may be approved by Licensor in writing (which approval shall not be unreasonably withheld) and subject, in any event, to Distributor's obligations to afford and maintain credits.

*     *     *

4. Licensor shall make delivery (and Distributor hereby acknowledges receipt of delivery) of the Picture upon the execution hereof by delivery to Distributor of the following: See Exhibit A. The materials referred to in Exhibit A, i.e., an internegative and optical sound tracks (herein called 'Said Pre-Print Material') shall remain on deposit in the Laboratory during the entire term of Distributor's license hereunder unless Distributor and Licensor shall otherwise agree in writing. Licensor represents and warrants that the Said Pre-Print Material shall conform to the positive print referred to in Exhibit A (herein called 'Said Print'). Licensor further represents, warrants and agrees that the Said Pre-Print Material is fit and suitable for the processing therefrom of positive prints equal in quality to the Said Print or, if not, that Licensor shall replace the Said Pre-Print Material or the defective part or parts thereof, as the case may be, with substitute material or materials which shall be of such standard.

*     *     *

6.  ....

(d) Except as expressly permitted in paragraph 2(a), Distributor shall not cut, edit, alter or change the Picture.

7.  ... As provided in Article 4, Licensor shall deliver to Distributor a schedule of advertising credits with respect to the Picture. Distributor agrees that it will observe such schedule and cause its subdistributors to agree to observe such schedule in all advertising and publicity relating to the Picture including trailers.

8.  ...

(b) *Advertising and Prints Guaranty.* Distributor guarantees that it shall spend not less than $75,000 for release prints and placement of media advertising within ninety (90) days from the initial theatrical release of the Picture. Distributor shall re-

tain copies of all invoices and paid bills in order to prove to the satisfaction of Producer that the foregoing guaranty has been met and such copies of all invoices and bills accruing for three (3) consecutive periods of time commencing as of the date hereof and ending July 30, 1983, August 30, 1983, and September 30, 1983 shall be forwarded to Producer within ten (10) days after the end of such period.

(c) Licensor hereby irrevocably appoints Inter-Ocean Film Sales, Ltd., having an office at 9255 Sunset Boulevard, Upper Penthouse, Los Angeles, California 90069 (herein called 'Licensor's Agent') as Licensor's Agent with respect to this Agreement and the Picture. All sums which shall become payable to Licensor pursuant to this Agreement shall be paid by check to the order of Licensor's Agent and shall be accompanied by a copy of the relevant accounting statement, if any. Any payments made to Licensor's Agent shall conclusively be deemed paid to Licensor.

9. ...

(c) On April 30, 1983, Distributor shall pay to Licensor an advance of Seventy-five Thousand U.S. Dollars (U.S. $75,000) which shall be recoupable under the following rights and conditions:

(i) The Licensor is to receive 15% of the first $1,000,000 of Theatrical Gross Receipts without any deductions except any applicable taxes or censorship fees or rating fees with the M.P.A.A.; 25% of the gross to the Licensor on film rental between $1,000,000–$1,500,000; 35% between $1,500,000–$2,000,000; 40% on $2,000,000–$2,500,000; 45% between $2,500,000–$3,000,000; and 50% over $3,000,000.

\* \* \*

11. The Distributor agrees to render periodic accounting statements and make payments to the Licensor as follows:

(a) The first accounting statement to be rendered hereunder shall be forwarded to Licensor no later than forty-five (45) days after the first day of theatrical release. Thereafter, accounting statements shall be rendered hereunder on a monthly basis for a period of three (3) years....

\* \* \*

13. Upon the expiration of the term of the license herein granted to the Distributor or any sooner termination thereof as herein provided, all rights, licenses, and privileges herein granted to the Distributor shall revert to the Licensor and the Distributor shall deliver to the Licensor at the places where then located, without charge, all material relating to the picture, including, without limitation, all prints thereof, which may then be in the possession or control of Distributor or its agents or sub-distributors ...

14. In the event that the Distributor shall fail to pay to Licensor any sum which Distributor has agreed to pay under this Agreement or shall fail to render to Licensor any accounting statement which Distributor has agreed to render under this Agreement, at the time the same is required to be paid or rendered pursuant to this Agreement, and any such default shall not be cured within twelve (12) days after written notice thereof shall be mailed by certified or registered mail, telegraphed or hand delivered to Distributor or Distributor's address for the receipt of communications hereunder; or in the event Distributor shall commit any other material default under this Agreement and any such default shall not be cured within thirty (30) days after written notice thereof shall be mailed by certified or registered mail, telegraphed or hand delivered to Distributor or Distributor's address for the receipt of communications hereunder; ... then and in any such event, in addition and without prejudice to any other rights or remedy which Licensor may have on account thereof, all licenses, rights and privileges of the Distributor under this Agreement, shall, at the option of Licensor, terminate and cease, and Licensor shall be entitled to immediate possession of any and all property relating to the Picture....

15. ...

A courtesy copy of all communications sent to Licensor shall concurrently be sent

to S.J. Nigrone, Esq., 1440 Broadway, New York, New York 10018. The failure to furnish any such courtesy copy shall affect the efficacy of any communication otherwise properly sent.

\* \* \*

17. No waiver by either party of any breach of this Agreement shall be deemed a waiver of any preceding or succeeding breach whether or not similar.

\* \* \*

19. This Agreement contains the entire understanding between the parties and may not be charged [sic] or terminated orally.

20. This Agreement shall be construed, and the rights and obligations of the parties hereunder shall be determined, pursuant to the laws of the State of New York applicable to agreements entered into and to be wholly performed within said state.